**Refugio LUGO et al., Plaintiffs,**

v.

**William E. SIMON et al., Defendants.**

**Civ. No. C 74-345.**

United States District Court,
N. D. Ohio, W. D.

April 21, 1978.

See also D.C., 426 F.Supp. 28.

John P. Worcester, Advocates for Basic Legal Equality, Toledo, Ohio, Marvin H. Feingold, Bowling Green, Ohio, Marilyn G. Rose, Joseph N. Onek, Center for Law and Social Policy, Washington, D. C.; for plaintiffs.

Sidney Edelman, Asst. Gen. Counsel for Public Health, Dept. of Health, Education and Welfare, Rockville, Md., Shirley Moscow, Dept. of Health, Education and Welfare, Chicago, Ill., Patrick J. Foley, Asst. U. S. Atty., Toledo, Ohio, for HEW.

John J. McCarthy, Chief, Gen. Litigation Section, Tax Div., U. S. Dept. of Justice, John M. Cunningham, Donald J. Gavin, Trial Attys., Tax Div., U. S. Dept. of Justice, Washington, D. C., Patrick J. Foley, Asst. U. S. Atty., Toledo, Ohio, for Sec. of Treasury and Commissioner of IRS.

William J. Brown, Atty. Gen. of Ohio, William J. McDonald, Asst. Atty. Gen., Columbus, Ohio, for state defendants Ackerman and Shirkey.

Richard B. McQuade, Swanton, Ohio, for defendants Fulton County Health Center and Director Victor Sernio.

## MEMORANDUM AND ORDER

DON J. YOUNG, District Judge.

This cause came to be heard upon motion for summary judgment and to dismiss filed with respect to both the Hill-Burton claims and federal tax claims of plaintiffs. The pending motions concerning the Hill-Burton branch of the case will be dealt with first.

Plaintiffs have filed motions for summary judgment against both the Secretary of Health, Education and Welfare and the state defendants, defendants Ackerman and Shirkey, who are the Director of the Ohio Department of Health and the Chief of the Division of Medical Facilities of the state department. Both motions and this branch of plaintiffs' complaint concern the asserted failure of HEW and the state defendants to undertake their responsibilities with regard to enforcement of assurances under Title VI of the Public Health Services Act, 42 U.S.C. § 291 *et seq.* (hereafter referred to as Title VI or the Hill-Burton Act). Plaintiffs' claims at issue concern the assurances made by federally assisted facilities under Title VI to provide a "reasonable volume of services to persons unable to pay therefor." 42 U.S.C. § 291c(e) (hereafter this assurance will be referred to as the "reasonable volume" assurance.) The motions for summary judgment are opposed by both HEW and the state defendants. Both HEW and the state defendants have filed motions which seek alternatively for the complaint to be dismissed or summary judgment to be entered against plaintiffs.

The Secretary of HEW has also filed a motion for summary judgment against the state defendants with regard to his cross-claim against them. The state defendants oppose this motion as well.

One of the few issues in this case which is not disputed is that under both Title VI of the Public Health Services Act and the regulations promulgated pursuant to the authority granted under the Act, 42 C.F.R. Part 53, a condition precedent to the provision of assistance under the Act was the submission of a state plan and approval of the plan by the Secretary. 42 U.S.C. §§ 291d(a), 291e(b)(3). Under 42 U.S.C. § 291d(a)(1) the state was required to designate a single state agency for the administration or the supervision of the administration of the plan. Under Ohio's plan, the agency designated was the Ohio Department of Health (Division of Medical Facilities).

Under 42 U.S.C. § 291c(e), regulations were to be issued prescribing:

(e) that the State plan shall provide . . . Such regulations may also require that before the approval of an application for a project is recommended by a State agency to the Surgeon General for approval under this part, assurance shall be received by the

State from the applicant that (1) the facility or portion thereof to be constructed or modernized will be made available to all persons residing in the territorial area of the applicant [community service assurance]; and (2) there will be made available in the facility or portion thereof to be constructed or modernized a reasonable volume of services to persons unable to pay therefor, but an exception shall be made if such a requirement is not feasible from a financial viewpoint. [reasonable volume assurance]

Regulations were in fact issued requiring the community service and reasonable volume assurance for participation in Title VI funding. 42 C.F.R. 53.111 and 53.113. The reasonable volume assurances apply to facilities for a period of 20 years after the completion of construction of any facility with respect to which funds were paid under the Act or for a longer period as provided under 42 C.F.R. 53.111(a). The regulations also provide (in accordance with the prior order of this Court) that the community service assurances apply for an indefinite period. 42 C.F.R. 53.113(a).

The question presented in the pending motions before this Court is not whether these assurances are binding on Title VI assisted facilities, but who is responsible for their enforcement and whether declaratory and equitable relief should be granted to assure that enforcement responsibilities under the Act are indeed performed.

Under 42 U.S.C. § 291e(b)(3), applications for assistance under Title VI could not be approved unless they were in conformity with the state plan and contained the community service and reasonable volume assurances required under § 291c(e) and regulations issued thereunder. Under § 291d(a)(2) a requirement for state participation in Title VI assistance was that the state plan:

(2) contain satisfactory evidence that the State agency designated in accordance with paragraph (1) of this subsection will have authority to carry out such plan in conformity with this part.

The regulations concerning community service and reasonable volume assurances specifically require that the state plan provide that the designated state agency will provide means of enforcement of these assurances. The regulations concerning both reasonable volume and community service assurances contain identical provisions concerning the responsibilities of the designated state agency for enforce assurances:

The State plan shall provide for adequate methods of enforcement of the assurance, including effective sanctions to be applied against any facility which fails to comply with such assurance. Such sanctions may include, but need not be limited to, license revocation, termination of State assistance, and court action. 42 C.F.R. 53.111(k)(3) and 53.113(f)(2).

Under the Ohio plan the Director of the Ohio Department of Health assumed certain duties with regard to enforcement of assurances under Title VI. With regard to the reasonable volume assurance the plan provides in pertinent part that:

IX. Other Duties of the Director:

A. Annually perform evaluations of the amount of various services provided in each facility to determine whether the assurances submitted by the facility are in compliance. Evaluate each facility for uncompensated services using financial statements filed pursuant to Section 646 of the Federal Act to show the financial operations of the facility and charges made for providing such services.

B. Investigate complaints charging a facility with failure to provide a reasonable volume of free care.

C. *Provide adequate methods of enforcement of the assurances, including effective sanctions to be applied against any facility which fails to provide a reasonable volume of free services. Such sanctions may include, but are not limited to, termination of State assistance or court action.* (Emphasis added).

D. Annually report to the Secretary the evaluation of each facility's compliance with the assurance, the disposition of each complaint received and proposed action.

\*   \*   \*   \*   \*   \*

G. The Director will apply, evaluate and enforce all of the requirements as published in the Federal Register, Volume 37, Number 142, as reprinted on July 22, 1972, and any amended guidelines that may be adopted either by the Department of Health, Education and Welfare or the Director, and deemed within the authority of the Director's office.

Under 42 U.S.C. § 291g, the Secretary is granted authority to terminate Title VI assistance where the state agency is not complying with the provisions of its state plan which are mandatory under § 291d.

It is not disputed that since the approval of the Ohio state plan, Title VI assistance has been provided to health care facilities in Ohio in the amount of $52,203,035. The enforcement of assurances issues in the case, however, are complicated first by the fact that the last appropriations available under Title VI ceased during the pendency of this action (on September 30, 1976) and, secondly, by the enactment of provisions under Title XVI of the National Health Planning and Resource Development Act (hereafter Title XVI), which affect the enforcement of assurances made to secure Title VI assistance. The relevant statutory enactments are 42 U.S.C. §§ 300o–1 and 300p–2(c).

Section 300o–1 requires the Secretary of HEW to promulgate regulations to prescribe in a general manner the requirements for compliance with Title VI assurances and to set forth the means by which assisted entities shall be required to demonstrate compliance. Under § 300o–1, the Secretary also is required to implement a procedure under which assisted entities are to submit data and information to the Secretary which reasonably supports a finding of compliance with Title VI assurances. Under § 300p–2(c), the Secretary is re-

quired to implement an independent monitoring procedure under which periodic investigations are to be conducted to ascertain compliance with Title VI assurances. The section also provides for private civil actions to obtain compliance with Title VI assurances under certain circumstances. The relevant statutory provisions are set forth below:

§ 300o–1. The Secretary shall by regulation—

\*   \*   \*   \*   \*   \*

(6) prescribe the general manner in which each entity which receives financial assistance under this subchapter or has received financial assistance under the subchapter or subchapter IV of this chapter shall be required to comply with the assurances required to be made at the time such assistance was received and the means by which such entity shall be required to demonstrate compliance with such assurances.

An entity subject to the requirements prescribed pursuant to paragraph (6) respecting compliance with assurances made in connection with receipt of financial assistance shall submit periodically to the Secretary data and information which reasonably supports the entity's compliance with such assurances. The Secretary may not waive the requirement of the preceding sentence.

§ 300p–2(c).

The Secretary shall investigate and ascertain, on a periodic basis, with respect to each entity which is receiving financial assistance under this subchapter or which has received financial assistance under subchapter IV of this chapter or this subchapter, the extent of compliance by such entity with the assurances required to be made at the time such assistance was received. If the Secretary finds that such an entity has failed to comply with any such assurance, the Secretary shall take the action authorized by subsection (b) of this section or take any other action authorized by law (including an action for specific performance brought by the At-

torney General upon request of the Secretary) which will effect compliance by the entity with such assurances. An appropriate action to effectuate compliance with any such assurance may be brought by a person other than the Secretary only if a complaint has been filed by such person with the Secretary and the Secretary has dismissed such complaint or the Attorney General has not brought a civil action for compliance with such assurance within 6 months after the date on which the complaint was filed with the Secretary.

### A. Cross-claim of the Secretary of Health, Education and Welfare.

On July 15, 1977, defendants Ackerman and Shirkey filed their second motion to dismiss or for summary judgment as to plaintiffs' claims against them. In the memorandum in support of the motion, the state defendants asserted that the plaintiffs' claims against them were moot by virtue of the enactment of the Title XVI provisions concerning the duties of the Secretary as to enforcement of Title VI assurances. The state defendants asserted in their brief:

> . . . [T]he Court should dismiss the State Defendants on the ground that they do not possess authority to monitor and enforce assurances given under Title VI or Title XVI. They will not have such authority unless and until the Secretary assigns it to them by regulation. (State Deft.'s Brief of July 15, 1977, p. 10).

Although the state defendants have argued that the complaint should be dismissed against them on other grounds as well, their argument concerning their present duties by virtue of Title XVI is based upon the contention that "the new statutory framework provides that the Secretary will perform the functions heretofore performed by the State agencies." (Id. at 4). Furthermore, the state defendants assert that the administrative complaint procedure under 42 U.S.C. § 300p–2(c) precludes any action by state agencies to enforce compliance with Title VI assurances against a non-complying entity unless the Secretary has failed to act on the complaint within a six-month period. (Id. at 6). The state defendants' position is therefore that the Ohio Department of Health has no enforcement duties absent the promulgation of the regulations under § 300o–1 and implementation of the complaint procedure under § 300p–2(c).

The Secretary sought leave to file a cross-claim against the state defendants (previously granted) on the basis that the contentions of the state defendants in opposition to plaintiffs' claims constitute an admission that the agency has failed, and will continue to fail, to adhere to the requirements of Title VI, pertinent regulations, and its state plan. The Secretary also asserts that the Ohio state plan is "ambiguous, vague, and confusing in certain areas, and has not been modified to incorporate explicitly regulatory amendments subsequent to its adoption." (Cross-claim ¶ 24).

The Secretary has filed a motion for summary judgment on his cross-claim as to all issues except the question of the ambiguity of the state plan and failure to amend it in accordance with pertinent regulations. The demanded relief at issue includes a request for an order:

1. Declaring that the state agency continues to have responsibilities for implementation and enforcement of "reasonable volume" and "community service" assurances under Title VI.

2. Declaring that the State Agency continues to have responsibilities for implementation and enforcement of "reasonable volume" and "community service" assurances under its state plan currently in effect.

3. Requiring that defendants Ackerman and Shirkey, their agents, servants, employees, attorneys, successors and all other persons in concert or participation with them, implement and enforce the currently effective state plan provisions regarding "reasonable volume" and "community service" assurances.

It is clear that the legislative intent behind the enactment of Title XVI's enforcement provisions was to place greater responsibilities upon the Secretary in the area of enforcement of assurances made to secure federal assistance. In evaluating the past performance of the Department of Health, Education and Welfare and the state agencies in implementing the free service requirements of Title VI, the Senate Report on the bill was extremely critical. S.Rep.No.93–1285, 93rd Cong., 2nd Sess., *reprinted in* [1974] *U.S.Code Cong. & Admin. News*, pp. 7842, 7900.

The legislative history behind the enactment of Title XVI enforcement of assurances provisions, however, fails to demonstrate an intent to remove the designated state agency as an enforcement mechanism for assurances made to secure federal assistance under Title VI. It is specifically provided under 42 U.S.C. § 291d(b) that the Secretary's assent is required prior to the modification of a state plan.

The Secretary maintains that the state agency continued to constitute an integral part of the enforcement scheme provided to assure compliance with "community service" and "reasonable volume" assurances under Title VI. The regulatory provisions promulgated after the enactment of Title XVI's enforcement provisions continue to provide for the participation of the designated state agency in enforcement of the obligations under the respective state plans. 40 Fed.Reg. 46203 (1975) (to be codified in 42 C.F.R. 53.111).

A continued role of the state agencies in the enforcement of Title VI assurances is consistent with prior practice and the new Title XVI provisions. With regard to the "reasonable volume" assurance, the state agency is to set eligibility criteria and to make them available on request (53.111(g)); the state agency is to set compliance levels (53.111(h)); the state agency is to monitor compliance, handle complaints, and take enforcement actions (53.111(k)).

The fact that Title VI funding has ceased does not alter the state's obligations. Under a federal grant program, there always remains the possibility of cessation of funding as appropriations are generally made on an annual basis. Furthermore, the assurances under Title VI for which the state obligated itself to enforce continue in effect beyond the completion of the construction. 42 C.F.R. 53.111, 53.113. It cannot be disputed that conditions can be placed on the award of federal funds.

Finally, any deficiency in the authority of the state agency under state law to impose sanctions on federally assisted facilities to secure compliance with Title VI assurances may be remedied by the state. Even under the present authority, the state agency can initiate legal action when necessary to assure compliance. See 42 C.F.R. 53.-111(k)(3); 53.113(f)(2); Ohio's Plan IX(c).

The Secretary's motion for partial summary judgment will therefore be sustained. The Ohio Department of Health, the designated Ohio agency under Title VI remains obligated to carry out the burdens assumed in its state plan with regard to enforcement and administration of Title VI assurances and relevant regulations despite the enactment of Title XVI. The responsibilities of the state in this regard remain in full force and effect absent a modification of the state plan pursuant to the procedure provided under 42 U.S.C. § 291d(b) or amendment of the regulations issued under authority granted in the Act. There exists no basis on which to find that the legislative intent behind the enactment of Title XVI's enforcement of assurances provisions was to invalidate the regulatory scheme then in existence and to relieve the states immediately upon enactment of the burdens undertaken to secure federal assistance.

### B. *Plaintiffs' Claims.*

Plaintiffs have filed motions for partial summary judgment against both the Secretary and the state defendants. The defendants, in turn, have filed cross-motions to dismiss or for summary judgment.

### 1. *Failure to Exhaust Administrative Remedies.*

Both the Secretary and the state defendants assert that the complaint should

be dismissed for failure to exhaust the administrative remedies available to plaintiffs. Both assert that the complaint procedure under 42 U.S.C. § 300p–2(c) creates a remedy which must be exhausted prior to the institution of a private civil action to compel compliance with Title VI assurances.

The difficulty here is the nature of the plaintiffs' remaining claims, as well as the fact that the required procedure became effective subsequent to the initiation of these proceedings. (The action was commenced with the filing of the complaint on August 26, 1974. Section 300p–2(c) was approved and became law on January 4, 1975.)

Prior to the enactment of § 300p–2(c), it had been held that a private civil remedy was implied under Title VI whereby indigents could maintain an action to enforce the Act's provisions concerning reasonable volume assurances. *Saine v. Hospital Authority of Hall County*, 502 F.2d 1033 (5th Cir. 1974); *Euresti v. Stenner*, 458 F.2d 1115 (10th Cir. 1972). Under § 300p–2(c), the Congress specifically provided for a private right of action with regard to enforcement of assurances under Title VI but placed specific limitations on the right. Under the section, the person seeking relief must first file a complaint with the Secretary and the Secretary must either have dismissed the complaint or six months must have elapsed without the initiation of a civil action by the Attorney General to secure compliance.

It has been recognized that the exhaustion of the administrative complaint procedure under the section is required prior to the initiation of an action against a federally-assisted hospital to compel it to comply with assurances it made to secure federal funds under Title VI. *Taylor v. Methodist Hosp., Inc.*, Civil No. C 76–531 (W.D.Tenn. May 19, 1977); *Gordon v. Forsyth County Hospital Authority*, 409 F.Supp. 708 (M.D. N.C.1976).

The intervening change of law is applicable in this action unless applying the statutory change would result "in manifest injustice or there is statutory or legislative history to the contrary." *Cort v. Ash*, 422 U.S. 66, 77, 95 S.Ct. 2080, 2087, 45 L.Ed.2d 26 (1976), *quoting, Bradley v. Richmond School Board*, 416 U.S. 696, 711, 94 S.Ct. 2006, 40 L.Ed.2d 476 (1974). Plaintiffs seek relief to compel future performance to secure compliance with Title VI assurances. Neither the legislative history of Title XVI nor the statutory provision itself indicates any intent that the requirement of exhaustion of the administrative complaint procedure be inapplicable to cases pending at the time of enactment. There is no "manifest injustice" in requiring plaintiff to pursue the statutory remedy to secure future compliance with Title VI assurances. *See Cort v. Ash, supra,* 422 U.S. at 77, 95 S.Ct. 2080.

Although plaintiffs contend otherwise, there is nothing presented under the facts which would justify either a finding that the administrative remedy is futile under the circumstances or that manifest injustice would result under the facts by requiring that the claims procedure be exhausted. It is not insignificant that the enactment of the claims procedure followed only shortly after the institution of this suit.

The Title VI claims against the remaining defendant hospitals and their administrators must therefore be dismissed. The action here, however, in addition includes an attack upon the asserted failure of the Ohio Department of Health to honor its obligations under the state's Title VI plan and regulations, as well as the asserted failure of the Secretary to undertake his duties as to enforcement of Title VI assurances.

The legislative history behind the enactment of § 300p–2(c) demonstrates a congressional intent to require an active role on the part of the Secretary in securing enforcement of Title VI assurances. The expression of dissatisfaction with the prior efforts of both the Secretary and designated state agencies in enforcement of these assurances was expressed in no uncertain terms. The prior enforcement efforts were described in the Senate report on Title XVI as a "sorry performance," and the report

quoted a prior GAO study which found that "the implementation of the free service requirement is in its infancy." S.Rep.No.93–1285, U.S.Code Cong. & Admin.News 1974, p. 7900, *supra.* The original senate bill even went so far as to require that HEW establish a permanent office to review compliance. Conf.R.No.93–1640, 93rd Cong., 2nd Sess., *reprinted in* [1974] *U.S.Code Cong. & Admin.News,* pp. 7971, 7997.

As with the Federal Election Commission as to claims under the Federal Elections Campaign Act amendments of 1974, considered by the Supreme Court in the decision of *Cort v. Ash,* the complaint procedure here demonstrates an intent to vest "primary jurisdiction" with the Secretary of HEW over any claimed violation of Title VI assurances. *See Cort v. Ash, supra* at 75, 95 S.Ct. 2080. It becomes apparent that to require exhaustion of administrative remedies by plaintiffs as to their Title VI claims against the state defendants would be consistent with the congressional intent behind the enactment of § 300p–2(c), if not compelled by the statute itself.

This Court makes no determination as to whether § 300p–2(c) applies to the claims against the state defendants. If it does not, the claims procedure nevertheless has been made available to such claims, and requiring that the claims concerning the asserted failure of the defendants to undertake their Title VI duties to secure compliance with assurances is nevertheless required under the doctrine of exhaustion of administrative remedies regardless of any statutory obligation. The administrative agency's interest in such a procedure includes:

(a) the agency's interest in having an opportunity to make a factual record and exercise its discretion and expertise without the threat of litigious interruption;

(b) the agency's interest in discouraging frequent and deliberate flouting of the administrative process; and

(c) the agency's interest in correcting its own mistakes and thereby obviating unnecessary judicial proceedings.

*United States v. Newmann,* 478 F.2d 829, 831 (8th Cir. 1973).

A consideration of the claims against the individual hospitals will necessarily involve a consideration of the state's asserted failure to perform its duties under its state plan and pertinent regulations. As the cross-claim of the Secretary demonstrates, the facts concerning the operation of the state plan may require a rethinking by the department of its past approach of assuming a state is complying with its duties under Title VI. Therefore, to the extent exhaustion of administrative remedies is not compelled by § 300p–2(c), the Court will nevertheless require it. This conclusion is supported by the allegations of the plaintiffs that the lack of compliance by the assisted hospitals originally named defendants is more a result of lack of supervision and guidance than a result of any deliberate refusal to carry out the assurances made to secure federal funds.

It is the opinion of this Court that the plaintiffs' claims against the Secretary concerning the particular provisions of the Ohio state plan must first be submitted to the Secretary prior to obtaining judicial review as well.

The asserted failure of the Secretary to promulgate regulations as required by 42 U.S.C. § 300o–1 is a different matter. The Secretary has a mandatory duty to issue regulations and to implement the data and information reporting requirements of the Act. Further delay with regard to this portion of plaintiffs' claims would serve no purpose and the delay itself would serve only to avoid the ultimate assumption of the duties of the Secretary. The Secretary has asserted no interest which would be served by requiring exhaustion as to these issues. Furthermore the time period for Title VI assurances as to "reasonable volume of free care" is in fact running out. Further delay clearly constitutes irreparable injury justifying an exception to the exhaustion requirement. Section 300p–2(c) is clearly inapplicable to these issues.

### 2. *Failure to Promulgate Regulations Pursuant to 42 U.S.C. § 300o–1.*

Over three years have passed since the enactment of Title XVI. Since January 5, 1975, the Secretary has been required to issue regulations prescribing in a general manner the requirements for compliance with Title VI assurances and the means by which compliance shall be demonstrated. 42 U.S.C. § 300o–1(6). Under the final two sentences of § 300o–1 the Secretary is also required to implement a procedure by which federally assisted entities are to submit data and information to the Secretary which supports a finding of compliance. The statute specifically provides that the Secretary cannot waive the reporting requirement, yet the procedure has not even been implemented.

Plaintiffs seek declaratory judgment that the Secretary has violated his duties under Title XVI by failing to issue regulations under § 300o–1(6) and failing to implement the data and information procedure under the section as well. Plaintiffs also seek injunctive relief compelling the Secretary to perform these duties as required by statute within a specified time period.

The Secretary does not deny that he is required to issue regulations under 42 U.S.C. § 300o–1(6). By affidavit of the Acting Director of the Division of the Department of Health, Education and Welfare charged with responsibility for the administration of Title VI and XVI. programs states that regulations are under development.

The Secretary states, however, with respect to the data and information reporting requirements set forth in the last two sentences of § 300o–1:

(1) that the issuance of the § 300o–1(6) regulations is a condition precedent to implementation of the re-reporting requirements of the last two sentences of § 300o–1(6);

(2) that no regulations are necessary to implement the data and information reporting requirement of the aforesaid provisions of § 300o–1; and

(3) that no reporting form can be imposed without the approval of the Director of the Office of Management and the Budget, who is not a party to this suit.

The vicious circle which the Secretary allegedly finds himself in can be broken through action on his own part. He can propose regulations under § 300o–1(6) and can submit a proposed reporting form to the Director of the Office of Management and the Budget. He has done neither.

■ The suggestion in the Secretary's brief in opposition to plaintiffs' motion for summary judgment that plaintiffs should be denied injunctive relief with regard to the Secretary's failure to promulgate regulations and failure to implement the data and information reporting procedure required under statute by virtue of the availability of the complaint procedure under § 300p–2(c) is unacceptable. The legislative history behind the imposition of the duties upon the Secretary concerning enforcement of Title VI assurances demonstrates that Congress specifically found that a complaint procedure alone is insufficient to secure compliance with assurances under the Act. S.Rep.No.93–1285, *supra.*

■ The fact that an extended period of time has elapsed without the issuance of regulations under § 300o–1(6) or the implementation of a reporting procedure required under the section alone does not justify equitable relief. The plaintiffs' motion for partial summary judgment as to declaratory and equitable relief as to these issues will be overruled, as well as the Secretary's motion to dismiss or for summary judgment to the extent the Secretary's motion addresses these same issues. The matter will be set for a prompt trial on the merits of plaintiffs' claims remaining against the Secretary.

### C. *Claims Concerning Revenue Ruling 69–545.*

With regard to the defendant Secretary of the United States Treasury and Commissioner of Internal Revenue, plaintiffs de-

mand equitable and declaratory relief based upon the asserted invalidity of Revenue Ruling 69–545 which sets forth the policy of the IRS as to what is required to qualify as a "charitable" organization for special tax treatment under the Internal Revenue Code of 1954. Sections 501(a) and (c)(3) of the Internal Revenue Code of 1954, 26 U.S.C. §§ 501(a) and (c)(3), exempt from federal income tax:

> (3) Corporations, and any community chest, fund, or foundation, organized and operated exclusively for religious, charitable . . . purposes, . . . no part of the net earnings of which inures to the benefit of any private shareholder or individual . . . .

Sections 170(a) and (c)(2) of the Code, 26 U.S.C. §§ 170(a) and (c)(2), allow a deduction to individual or corporate taxpayers of a contribution to nonprofit charitable corporations. Other indirect benefits to nonprofit charitable corporations are provided in other sections of the Code. *See* 26 U.S.C. §§ 642(c), 2055(a)(2), 2106(a)(2)(A)(ii), 2522(a)(2) and (b)(2).

The Code does not define the term "charitable." In 1956, the IRS issued Revenue Ruling 56–185 to provide guidelines as to qualification as "charitable" organizations for the foregoing beneficial tax treatment under the Code. In 1969, the IRS revised the prior revenue ruling through the issuance of Revenue Ruling 69–645.

In *Simon v. Eastern Ky. Welfare Rights Org.*, 426 U.S. 26, 29–32, 96 S.Ct. 1917, 1920, 48 L.Ed.2d 450 (1976), the Supreme Court set forth the relevant history of the IRS revenue rulings on qualification as a charitable hospital under the Code, comparing and contrasting the former revenue ruling with Revenue Ruling 69–645:

> In recognition of the need of nonprofit hospitals for some guidelines on qualification as "charitable" corporations, the IRS in 1956 issued Revenue Ruling 56–185. This Ruling established the position of the IRS to be "that the term 'charitable' in its legal sense and as it is used in § 501(c)(3) of the Code contemplates an

implied public trust constituted for some public benefit . . . ." In addition, the Ruling set out four "general requirements" that a hospital had to meet, "among other things," to be considered a charitable organization by the IRS. Only one of those requirements is important here, and it reads as follows:

> "It must be operated to the extent of its financial ability for those not able to pay for the services rendered and not exclusively for those who are able and expected to pay. It is normal for hospitals to charge those able to pay for services rendered in order to meet the operating expenses of the institution, without denying medical care or treatment to others unable to pay. The fact that its charity record is relatively low is not conclusive that a hospital is not operated for charitable purposes to the full extent of its financial ability. It may furnish services at reduced rates which are below cost, and thereby render charity in that manner. It may also set aside earnings which it uses for improvements and additions to hospital facilities. It must not, however, refuse to accept patients in need of hospital care who cannot pay for such services. Furthermore, if it operates with the expectation of full payment from all those to whom it renders services, it does not dispense charity merely because some of its patients fail to pay for the services rendered."

Revenue Ruling 56–185 remained the announced policy with respect to a nonprofit hospital's "charitable" status for 13 years, until the IRS issued Revenue Ruling 69–545 on November 3, 1969. This new Ruling described two unidentified hospitals, referred to simply as Hospital A and Hospital B, which differed significantly in both corporate structure and operating policies. The description of Hospital A included the following paragraph:

> "The hospital operates a full time emergency room and no one requiring emergency care is denied treatment.

The hospital otherwise ordinarily limits admissions to those who can pay the cost of their hospitalization, either themselves, or through private health insurance, or with the aid of public programs such as Medicare. Patients who cannot meet the financial requirements for admission are ordinarily referred to another hospital in the community that does serve indigent patients."

Despite Hospital A's apparent failure to operate "to the extent of its financial ability for those not able to pay for the services rendered," as required by Revenue Ruling 56–185, the IRS in this new Ruling held Hospital A exempt as a charitable corporation under § 501(c)(3). Noting that Revenue Ruling 56–185 had set out requirements for serving indigents "more restrictive" than those applied to Hospital A, the IRS stated that "Revenue Ruling 56–185 is hereby modified to remove therefrom the requirements relating to caring for patients without charge or at rates below cost."

Plaintiffs contend that Revenue Ruling 69–545 is invalid on the basis first, that it does not comport with the provisions of 26 U.S.C. § 501(c)(3) and secondly, that the revenue ruling was issued without notice and an opportunity to comment as allegedly required under the Administrative Procedure Act. Defendants have filed a renewed motion to dismiss asserting:

(1) that plaintiffs lack standing;

(2) that the action is barred by the Anti-Injunction Act, 26 U.S.C. § 7421 and by the federal tax exception to the Declaratory Judgment Act, 28 U.S.C. §§ 2201–2202; and

(3) that the plaintiffs have failed to state a claim upon which relief may be granted.

1. *Standing*

■ The question of the standing of indigent persons denied treatment at nonprofit hospitals which the IRS had determined to be qualified under Revenue Ruling 69–545 for special tax treatment as charitable or-

ganizations under the Code to attack the validity of Revenue Ruling 69–545 was specifically addressed in the Supreme Court decision of *Simon v. E.K.W.R.O., supra.* In that decision, the Supreme Court vacated judgment and remanded the case to be dismissed on the basis that plaintiffs lacked standing to raise the issue of the validity of the revenue ruling.

The *Simon v. E.K.W.R.O.* decision was based on the constitutional principles of standing under Article III limiting federal jurisdiction to actual cases and controversies. The Court recognized that an additional nonconstitutional standing requirement that a plaintiff must "at least be 'arguably within the zone of interests to be protected or regulated' by the statutory framework within which his claim arises." *Simon v. E.K.W.R.O., supra* at 39 n. 19, 96 S.Ct. at 1925, *quoting Data Processing Service v. Camp,* 397 U.S. 150, 153, 90 S.Ct. 827, 25 L.Ed.2d 184 (1969). The second standing issue was not reached by the Court in the *Simon* decision.

In the *Simon* case, plaintiffs included indigent persons who had sought medical care but were not admitted by hospital authorities because of their inability to pay a deposit or advance fee, at least one person who had been refused emergency-room treatment because of an inability to immediately pay; and another who was provided treatment but subsequently was billed and threatened with suit despite the fact that his indigency was known at the time treatment was provided. The basis of the asserted right to relief was that the hospitals were "encouraged" to deny services to indigents by virtue of the change in IRS policy with regard to qualification as a charitable organization under Revenue Ruling 69–545.

The Supreme Court held in the case that for Article III purposes, the indirectness of an injury:

. . . while not necessarily fatal to standing, "may make it substantially more difficult to meet the minimum requirement of Article III: *to establish that, in fact, the asserted injury was the consequence of the defendants' actions, or*

that prospective relief will remove the harm." *Simon v. E.K.W.R.O., supra* 426 U.S. at 44–45, 96 S.Ct. at 1927, *quoting, Warth v. Seldin,* 422 U.S. 490, 505, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975). (Emphasis added.)

On the record before it, the Supreme Court found that it was purely speculative whether plaintiffs' injuries could be fairly traced to the change in IRS policy rather than found to be the result of the independent action of the hospitals concerned. Specifically, the Court held that the contention that the change in IRS policy "encouraged" a change in hospital policy and the implicit corollary that declaring the ruling invalid and granting equitable relief would "discourage" the denial of medical services does not necessarily lead to a conclusion either that the denial of access to hospital services results from the revenue ruling or that should relief be granted that it would result in the availability of such services. The necessary inferences were deemed speculative. However, it must be noted that there was no allegation in the complaint concerning the "dependence upon charitable contributions of any hospitals that might have denied services . . . ." *Simon v. E.K.W.R.O., supra,* 426 U.S. at 43 n. 24, 96 S.Ct. at 1927.

From a reading of the *Simon* decision, it appears that for Article III purposes, standing would have been established in the case had plaintiffs undertaken the burden of showing that the hospitals involved, or some of them were:

. . . so financially dependent upon favorable tax treatment afforded charitable organizations that they would admit respondents if a court required such admission as a condition to receipt of that treatment. *Simon v. E.K.W.R.O., supra* at 43, 96 S.Ct. at 1926.

Plaintiffs in this action have alleged such a dependency on favorable tax treatment by the hospitals concerned and have also undertaken to demonstrate the contention through the filing of materials in the action setting forth financial data of the hospitals concerned showing the amounts of charitable contributions received and comparisons of receipts against expenses for fiscal years 1969 through 1976.

Plaintiff Perez was twice denied admission to Memorial Hospital of Sandusky County. The financial data filed by plaintiff demonstrates that the hospital would have operated at a loss during six of the seven years for which data was provided but for charitable contributions. Based upon the record before this Court, the contentions of plaintiffs, at least as to that hospital, as to the dependency on favorable tax treatment as a charitable organization are clearly more than speculative. The allegations of the complaint as supported by the financial data submitted are clearly sufficient to withstand the defendants' motion to dismiss for lack of standing.

2. *Anti-Injunction Act and Federal Tax Exception to the Declaratory Judgment Act.*

■ Defendants also contend that this action is barred by the federal tax exception to the Declaratory Judgment Act, 28 U.S.C. §§ 2201–2202 and by the Anti-Injunction Act, 26 U.S.C. § 7421. The relevant provisions of the Anti-Injunction Act provide:

(a) . . . [N]o suit for the purpose of restraining the assessment or collection of any tax shall be maintained in any court by any person, whether or not such person is the person against whom such tax was assessed. 26 U.S.C. § 7421(a).

The Declaratory Judgment Act provides a specific exception under 28 U.S.C. § 2201 with respect to actions brought concerning federal taxes:

In a case of actual controversy within its jurisdiction, except with respect to Federal taxes, any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, . . .
(Emphasis added).

The Court of Appeals for the District of Columbia reached these issues in the specific context presented here in its consideration of the *Simon* case. *E.K.W.R.O. v. Simon,* 165 U.S.App.D.C. 239, 506 F.2d 1278 (1974). The decision was vacated by the Supreme Court on the basis of lack of standing, the Supreme Court therefore finding it unnecessary to deal with the other issues presented in the case. This Court finds the decision of the court of appeals in *Simon* as to the issues concerning the Anti-Injunction Act and Declaratory Judgment Act persuasive and will follow it.

Specifically, the action is not one to enjoin or impede the collection of any tax, nor is it in the nature of a suit for a refund. Rather, the action is one seeking to force the IRS to tax contributions made to the hospitals concerned herein. The action therefore neither comes within the express terms of the statute, nor within its purpose as set forth by the Supreme Court in prior decisions involved the statute. *See Bob Jones University v. Simon,* 416 U.S. 725, 94 S.Ct. 2038, 40 L.Ed.2d 496 (1974); *Enochs v. Williams Packing and Navigation Co.,* 370 U.S. 1, 82 S.Ct. 1125, 8 L.Ed.2d 292 (1962).

With regard to the prohibition in the Declaratory Judgment Act as to actions concerning federal taxes, the court of appeals, in its decision in *Simon* considered the legislative history of the statute and held that the congressional intent was to create a prohibition as to actions concerning federal taxes coterminous with that provided in the Anti-Injunction Act so as to preclude circumvention of the provisions of the Anti-Injunction Act through the maintenance of an action seeking declaratory relief only. *E.K.W.R.O. v. Simon, supra,* 165 U.S.App.D.C. at 246, 506 F.2d at 1285. Although the exception provided in the Declaratory Judgment Act could be read to provide a broader prohibition as to such actions than that provided in the Anti-Injunction Act, the court of appeals declined to do so. This Court adopts the reasoning of the Court of Appeals for the District of Columbia in the *Simon* decision, and therefore holds that as the action is not barred by the Anti-Injunction Act, the federal tax exception to the

Declaratory Judgment Act does not preclude declaratory relief either.

### 3. *Failure to State a Claim.*

■ The court of appeals in *Simon* held that "Revenue Ruling 69–545 is founded on a permissible definition of the term "charitable" and is not contrary to any express Congressional intent"; that the revenue ruling is an interpretive ruling which under 5 U.S.C. § 553(b)(A) is exempt from the notice and comment provisions of § 553; and that the agency action cannot be characterized as arbitrary, capricious or otherwise an abuse of discretion so that the ruling could be set aside pursuant to 5 U.S.C. § 706(2)(A). *E.K.W.R.O. v. Simon,* 165 U.S.App.D.C. at 247–252, 506 F.2d at 1286–1291. The parties have essentially reargued here the issues considered by the court of appeals in the *Simon* decision.

This Court finds the decision of the Court of Appeals for the District of Columbia persuasive and will follow it. The parties are referred to that opinion for an extensive discussion of the issues concerned as it would serve little purpose to restate them in full here. In rejecting plaintiffs' contentions in that case as to the asserted invalidity of Revenue Ruling 69–545, the court of appeals recognized that the definition of the term charitable has never been static, that it is capable of a definition far broader than solely relief to the poor, and that the failure to enact an amendment in 1969 to 26 U.S.C. § 501, which would have provided exempt status to all non-profit hospitals cannot be interpreted as an indication of Congressional intent adverse to the new ruling. The new ruling still requires the operation of an emergency room and availability of emergency room services to the poor. The provisions of the Internal Revenue Code concerned are clearly distinguishable from the provisions of the Hill-Burton Act considered earlier in this memorandum as provisions were specifically provided under Hill-Burton for the provision of a reasonable volume of services to persons unable to pay therefor. 42 U.S.C. § 291c(e).

With regard to the asserted invalidity of the revenue ruling for failure to comply

with the notice and opportunity to comment provisions of the Administrative Procedure Act, the court of appeals found the revenue ruling clearly interpretive rather than substantive in nature making the notice and comment provisions of the Act inapplicable under 5 U.S.C. § 553(b)(A).

In his treatise on Administrative Law, Professor Kenneth Culp Davis treated the decision in the following terms:

> The court was clearly right in its application of the APA. No reasonable argument can be made that the APA requires notice and comment procedure for an interpretive rule, and the rule was clearly interpretative, because it was not issued pursuant to a grant of power of making law through rulemaking. K. Davis, *Administrative Law of the Seventies*, § 6.01–9 at 94–75 (Cu.Supp.1977).

Professor Davis argues further, however, that in view of the substantial impact of the revenue ruling that under common law, the court of appeals could have required a "reasonable opportunity for comment to those materially affected" independent of the provisions of the Administrative Procedure Act. *Id.* While it cannot be disputed that the agency would have been exercising its discretion with regard to such matters wisely had notice and an opportunity to comment been provided prior to the modification of the agency's prior ruling, this Court cannot find authority existing independently of the Administrative Procedure Act to hold a revenue ruling invalid for failure to provide such a comment procedure.

Professor Davis bases the common law power substantially on prior decisions of the Court of Appeals of the District of Columbia. However, that court did not impose such a standard in the *Simon* case. Other courts of appeal have not imposed such a rule under equally harsh circumstances. *Rainbow Valley Citrus Corp. v. Federal Crop Insurance Corp.*, 506 F.2d 467 (9th Cir. 1974); *Shell Oil Co. v. FPC*, 491 F.2d 82 (5th Cir. 1974).

The motion of defendant Secretary of the United States Treasury and Commission of Internal Revenue to dismiss will, therefore, be sustained.

FOR THE REASONS STATED, GOOD CAUSE APPEARING, IT IS

ORDERED that the motion of defendants Ackerman and Shirkey to dismiss plaintiffs' claims against them be, and it hereby is, sustained and the action is hereby dismissed as to plaintiffs' claims against defendants Ackerman and Shirkey for failure to exhaust administrative remedies; and it is

FURTHER ORDERED that the motion of the Secretary of Health, Education, and Welfare to dismiss plaintiffs' claims against him is overruled both with regard to the demand for relief concerning failure of defendant Secretary to issue regulations required under 42 U.S.C. § 300$o$–1 and failure to implement the data and information reporting procedure under 42 U.S.C. § 300$o$–1 and also with regard to the validity of regulations heretofore considered in the memorandum and order filed July 20, 1976, but in all other respects, the motion to dismiss is sustained for failure of plaintiffs to exhaust available administrative remedies; and it is

FURTHER ORDERED that the motion of defendant Secretary of Health, Education and Welfare for partial summary judgment against defendants Ackerman and Shirkey on his cross-claim be, and it hereby is, sustained as hereinafter set forth:

(1) The Ohio Department of Health, as the designated state agency under Ohio plans submitted for the allocation of Hill-Burton assistance to assisted entities within the State of Ohio, continues to have responsibilities for implementation and enforcement of "reasonable volume" and "community service" assurances made to the designated state agency by such assisted entities to secure federal assistance, and

(2) The Ohio Department of Health continues to have responsibilities for implementation and enforcement of "reasonable volume" and "community service" assurances under its State

Plan currently in effect absent modification of the plan under the procedure set forth in 42 U.S.C. § 291d(b), and

(3) Defendants Ackerman and Shirkey, their agents, servants, employees, successors and all other persons in concert or participation with them shall be, and hereby are, ORDERED TO IMPLEMENT AND ENFORCE the currently effective state plan provisions regarding "reasonable volume" and "community service" assurances made by federally assisted entities in Ohio;

and it is

FURTHER ORDERED that the motion of defendants Secretary of the United States Treasury and Commissioner of Internal Revenue to dismiss plaintiffs' claims concerning the validity of Revenue Ruling 69–545 be, and it hereby is, sustained, and the claims of plaintiffs concerning the validity of Revenue Ruling 69–545 are hereby dismissed as to all defendants; and it is

FURTHER ORDERED that the Hill-Burton claims of plaintiffs against the defendant hospitals and their administrators be, and they hereby are, dismissed for failure to exhaust available administrative remedies.

IT IS SO ORDERED.