Uneeda DAVIS et al.,
Plaintiffs–Appellants,

v.

BALL MEMORIAL HOSPITAL ASSOCI-
ATION; Patricia Roberts Harris, in her
capacity as Secretary of Health, Educa-
tion and Welfare et al., Defendants–Ap-
pellees.

No. 80–1209.

United States Court of Appeals,
Seventh Circuit.

Argued June 4, 1980.

Decided Oct. 3, 1980.

Rehearing and Rehearing En Banc
Denied Dec. 3, 1980.

John C. Hoyle, Dept. of Justice, Washington, D.C., for defendants–appellees.

Before FAIRCHILD, Chief Judge, CUMMINGS, Circuit Judge, and GRANT, Senior Judge.*

CUMMINGS, Circuit Judge.

Plaintiffs, three indigent persons formerly patients at Ball Memorial Hospital in Delaware County, Indiana,[1] originally brought this suit on behalf of themselves and all low income persons who have received or will receive care there charging violations of the defendant Hospital's obligations under the Constitution and the Hill–Burton Act, 42 U.S.C. § 291, *et seq.*[2] After the Hospital moved to join as defendants the members of the Indiana State Board of Health, the State Health Commissioner and the Secretary of Health, Education and Welfare (now Health & Human Services), plaintiffs amended their complaint to include these parties and to broaden the class to all persons in Indiana eligible for uncompensated services under the Act. On September 10, 1979, the Secretary moved to be dismissed as a party to the lawsuit, and on December 17, 1979, the district court granted the motion, thus eliminating the two relevant claims of the complaint insofar as they involved allegations concerning the Secretary. The district court thereafter denied plaintiffs' motion to enter this dismissal as a final judgment under Rule 54(b), and plaintiffs appealed. We now reverse and remand the district court's order with respect to one claim and affirm with respect to the other.

Jane A. Cullen, Legal Services Organization of Indiana, Inc., Bloomington, Ind., for plaintiffs–appellants.

---

* The Honorable Robert A. Grant, Senior District Judge of the United States District Court for the Northern District of Indiana, is sitting by designation.

1. Only two of the original named plaintiffs, Uneeda Davis and Kathy Bright, are parties to this case on appeal. Judge Holder dismissed the third named plaintiff, Susan Barber, because of her apparent failure to wait six months after filing a complaint with the defendant Secretary before filing suit, as required by the statute. 42 U.S.C. § 300p–2(c). That dismissal is not an issue on appeal.

2. Also named as a defendant in the original and amended complaints was Emergency Physicians of Delaware County, Inc., described as "a not–for–profit corporation chartered to provide emergency medical services to those in and around Delaware County, Indiana, including those patients treated at the Ball Memorial Hospital emergency room." (Am.Cplt., par. 10). Judge Holder ordered the dismissal of this defendant from the suit, and it is not a party to the appeal, nor is its dismissal relevant to any issue now before this Court.

Originally enacted in 1946, the Hill–Burton Act [3] provides federal assistance for the construction and modernization of medical facilities nationwide. As a condition of receiving funds under the program, the Act requires each facility to give "assurances" that it will provide "a reasonable volume of services to persons unable to pay therefor" to the extent that the financial condition of the facility permits. 42 U.S.C. § 291c(e).[4] The tortuous development of the assurances requirement since adoption of the Act is set out in detail in the two opinions in *American Hospital Association v. Harris*, 625 F.2d 1328 (7th Cir., 1980) [5] and there is no need to repeat it here. Nevertheless, a brief overview of that development as it applies to this case may be useful.

Despite the presence of the assurances requirement in the Act, the Secretary failed to take steps to implement the provision until 1972, when substantive regulations were finally promulgated.[6] Those regulations, amended in 1974, stipulated that a facility could meet its indigent–care obligations either by setting aside for uncompensated services 3% of its operating costs or 10% of such federal assistance, whichever is less, or by simply certifying that it would not exclude any person because of an inability to pay for medical care. 42 C.F.R. § 53.111(d). The Secretary's power to ensure compliance with the regulations was, however, diluted by the structure of the Act. The Secretary's primary role was to see that the assurances were reflected in state health plans while State authorities were otherwise responsible for specific en-

forcement. As a consequence, efforts to effect compliance remained lax. See S.Rep.No. 93–1285, 93d Cong., 2d Sess., reprinted in U.S.Code Cong. & Admin.News pp. 7842, 7900 (1974).

In 1974, Congress passed Title XVI of the Public Health Services Act (42 U.S.C. § 300*o*), amending the Hill–Burton Act in part to provide stricter enforcement of the uncompensated services program. The new legislation gave the Secretary direct investigative and enforcement power, including the authority to withhold payments (42 U.S.C. § 300p–2(c)), acknowledged the possibility of private actions against the facilities (*id.*), and directed the Secretary to adopt new regulations for the uncompensated services program. 42 U.S.C. §§ 300*o*-1(5) and (6). The Secretary was again slow to respond to this last directive. On May 18, 1979, however, the Secretary promulgated the current regulations, which *inter alia* set out eligibility criteria (42 C.F.R. § 124.506), prescribe the level of uncompensated services required for compliance with the assurances (42 C.F.R. § 124.503), provide for individual notice to patients regarding the availability of the services (42 C.F.R. § 124.505), and establish procedures for the determination of benefits (42 C.F.R. § 124.508). The 1979 regulations no longer allow a facility to meet its obligations by merely certifying that it will not exclude a patient because of an inability to pay. Compare 42 C.F.R. § 124.503 with 42 C.F.R. § 53.111(d).

Before the Secretary issued the 1979 regulations, plaintiffs filed this suit in federal

---

**3.** The Hill–Burton Act is the popular name for the program begun in 1964 under Title VI of the Public Health Services Act. 42 U.S.C. §§ 291 to 291*o*-1. In 1975, as part of the National Health Planning and Resources Development Act of 1974, Congress added Title XVI to the Public Health Services Act. 42 U.S.C. §§ 300*o* to 300t. Both titles are involved in this litigation. Some of these sections have now been repealed or recodified (see *e. g.*, current 42 U.S.C. §§ 300s, 300s–6), but to avoid confusion we will use the older section references.

**4.** A comparable provision appears in Title XVI. See 42 U.S.C. § 300*o*–3(b)(1)(J).

**5.** The issue in *American Hospital Association*, an appeal from the denial of a preliminary

injunction, was whether the Secretary acted within the statutory mandate in adopting his regulations (42 C.F.R. §§ 124.50 *et seq.*; see discussion *infra*). The dispute in that case centered on provisions of those regulations that are merely a small part of the regulatory scheme. The resolution of that case on the merits will not directly affect this litigation. See *American Hospital Association, supra*, 625 F.2d at 1331, 1342, discussing 42 C.F.R. §§ 124.503(b) and 124.509(b).

**6.** The regulations in force between 1946 and 1972 merely restated the statutory requirement that facilities give such assurances.

court.[7] In an amended complaint, filed April 26, 1979, plaintiffs alleged[8] that plaintiffs Davis and Bright, formerly patients at Ball Memorial Hospital, had inadequate resources to pay for their medical services, received no notice of the availability of uncompensated services, gained no determination of eligibility, and encountered difficulties in applying after discharge for a settlement of their bills under the program.[9] They brought suit against a variety of defendants to compel compliance with the Act's directives, filing on behalf of themselves and "[a]ll consumers of health care services who have been, are, or will be eligible for uncompensated services from defendant [ ] Ball Memorial Hospital Association, Inc." and "[a]ll consumers of health care services who have been, are, or will be eligible for uncompensated services from any facility located in the State of Indiana which receives funds pursuant to the Hill–Burton Act." (Am.Cplt., par. 14).

Only two claims of the amended complaint are relevant to this appeal. Claim 4 charges the Secretary and the individual state defendants with violating the Due Process Clause of the Fourteenth Amendment[10] by failing to adopt in federal regulations or the state plan proper notice and determination procedures.[11] Claim 6 charges the Secretary alone with violating the Hill–Burton Act by failing to issue proper regulations or to monitor properly compliance with the assurance obligations.[12]

---

**7.** This suit was merely one of several filed around the country to prod the Secretary into promulgating regulations. See *Newsom v. Vanderbilt, Univ.*, 453 F.Supp. 401 (M.D.Tenn. 1978); *Lugo v. Simon*, 453 F.Supp. 677 (N.D. Ohio 1978).

**8.** Because the district court dismissed the claims against the Secretary on the pleadings, we must take as true all well–pleaded allegations of the complaint.

**9.** Plaintiff Barber (see note 1 *supra*) made similar allegations.

**10.** The amended complaint mentions only the Fourteenth Amendment, though as the district court noted and plaintiffs of course concede, the claims against the Secretary are properly brought under the Due Process Clause of the Fifth Amendment. Like the district court, we find that nothing depends on this purely technical error.

**11.** Claim 4 states in full:

"83. Defendants Bloodgood, Butler, Kerr, McDermott, McSoley, Miller, Rosser, Worley, Levinson, Paynter and Califano have violated the Due Process Clause of the Fourteenth Amendment to the United States Constitution by failing in the federal regulations, Indiana State Plan or any other rules and regulations, to require a Hill–Burton facility in Indiana to:

a. Adequately notify Plaintiffs in writing of the availability of uncompensated services pursuant to the Hill–Burton Act, 42 U.S.C. § 291 *et seq.* and of their right to apply for such services.

b. Give to Plaintiffs written notice detailing the denial, reasons for denial, and evidence relied on in denying the applications for uncompensated services.

c. Indicate to Plaintiffs the criteria utilized in determining eligibility.

d. Give Plaintiffs an effective opportunity to present affirmative evidence concerning their eligibility for uncompensated services and an opportunity to refute adverse evidence before a decision–maker who has not participated in making the initial finding of ineligibility."

**12.** Claim 6 provides in full:

"85. Defendant Joseph Califano [now Patricia Harris] has violated the Hill–Burton Act, 42 U.S.C. § 291, *et seq.* and its implementing statutory and regulatory provisions by:

a. Failing to promulgate final regulations for administration of the Hill–Burton program, as required by 42 U.S.C. § 300*o*–1 *et seq.*

b. Failing to adequately monitor and investigate either the Indiana State Board of Health and individual facilities in Indiana which receive Hill–Burton funding to determine whether there is compliance with federal regulations, the Indiana State Board of Health state plan, or any assurances given by any facilities or the State Board in connection with the Hill–Burton program, as required by 42 U.S.C. § 300*o*–2(c) [300p–2(c)].

c. Failing to establish an adequate procedure for investigation and enforcement of assurances made by individual Hill–Burton facilities in Indiana, including sufficient personnel to effectively enforce the Hill–Burton program.

d. Failure to sanction violations of assurances made by Defendants Ball Memorial Hospital Association, Emergency Physicians of Delaware County, Inc., defendant members of the State Board of Health, or other facilities in Indiana, as required by 42 U.S.C. § 291 *et seq.* and § 300p–2(c)."

Plaintiffs sought a judgment against the Secretary declaring that she has violated and continues to violate the Act and that she has violated and is still violating the Due Process Clause. They also sought an order requiring the Secretary to comply with her duties under the Act and to "inform Hospitals and enforce [her] duty to provide due process of law protection."

Shortly after amending the complaint, plaintiffs moved for a determination of their class action claims. The Secretary responded to these claims and then, relying in part on the May 18, 1979, issuance of new regulations, moved for dismissal from the lawsuit. On December 17, the district court granted the latter motion. Judge Holder found that the allegations of Claim 4 had been mooted "to a great extent" by the new regulations and to the extent they had survived, the allegations failed because plaintiffs had not exhausted their administrative remedies as provided by the Administrative Procedure Act (5 U.S.C. § 553(e))[13] (App. 39–40). With respect to Claim 6, the district court held that the Act provided no private right of action against the Secretary or in the alternative, that plaintiffs had failed to exhaust the administrative remedies expressly provided in the Hill-Burton statute as a prerequisite to such a suit (App. 40–42).[14] Judge Holder subsequently refused to enter this order as a final decision under Rule 54(b) (R. 260). Plaintiffs then appealed.

*Appealability*

█ The Secretary contends first that the decision of the district court is not appealable. Clearly, Judge Holder's decision is not by its nature a final decision under 28 U.S.C. § 1291, and his refusal to grant plaintiffs' motion to enter the dismissal as a final judgment under Rule 54(b) of the Federal Rules of Civil Procedure forecloses plaintiffs' only other available means for meeting standard jurisdictional requirements. Plaintiffs assert nonetheless that as a decision denying all relief, including injunctive relief, against the Secretary, the district court's ruling is an interlocutory order "granting, continuing, modifying, refusing or dissolving injunctions, or refusing to dissolve or modify injunctions," thereby qualifying for the exception to the final decision rule found in Section 1292(a)(1) of the Judicial Code. We agree.

First, it is settled that a district court's refusal to make an entry under Rule 54(b) does not preclude appellate jurisdiction under § 1292(a)(1). *Tapeswitch Corp. of America v. Recora Co.*, 527 F.2d 1013 (7th Cir. 1976). Rule 54(b), which affords the district court an opportunity to apply its first-hand knowledge of the case to the question of the separability of certain parts of the action, provides for appellate review in some cases in which Section 1292(a)(1) does not and results in its denial by the district court in some cases in which Section 1292(a)(1) grants jurisdiction. Therefore it remains for the Court of Appeals to con-

---

13. That Section provides that "[e]ach agency shall give an interested person the right to petition for the issuance, amendment, or repeal of a rule."

14. The Section relied on by both the district court and the plaintiffs was 42 U.S.C. § 300p–2(c), which provides in full:

"(c) The Secretary shall investigate and ascertain, on a periodic basis, with respect to each entity which is receiving financial assistance under this subchapter or which has received financial assistance under subchapter IV of this chapter or this subchapter, the extent of compliance by such entity with the assurances required to be made at the time such assistance was received. If the Secretary finds that such an entity has failed to comply with any such assurance, the Secre-

tary shall take the action authorized by subsection (b) of this section or take any other action authorized by law (including an action for specific performance brought by the Attorney General upon request of the Secretary) which will effect compliance by the entity with such assurances. An appropriate action to effectuate compliance with any such assurance may be brought by a person other than the Secretary only if a complaint has been filed by such person with the Secretary and the Secretary has dismissed such complaint or the Attorney General has not brought a civil action for compliance with such assurance within 6 months after the date on which the complaint was filed with the Secretary."

sider independently the availability of jurisdiction under the excepting statute. This conclusion does not mean that the policies behind Rule 54(b) regarding the inadvisability of piecemeal review and the dangers of splitting a cause of action should not be considered by this Court in the application of Section 1292(a)(1) to any particular case. Defendants are quite correct to raise those issues here. Rather, a weighing of these policies against the competing considerations this case draws from Section 1292(a)(1) results in our conclusion that the question is appealable.

Behind the exception provided by Section 1292(a)(1) lies a recognition that a request for injunctive relief inevitably presents pressing equitable issues, including the question of irreparable injury, and that such concerns require speedy settlement through prompt appellate review of the balance struck by the district court. *Gardner v. Westinghouse Broadcasting Co.*, 437 U.S. 478, 480, 98 S.Ct. 2451, 2453, 57 L.Ed.2d 364. Therefore, although dismissal of some but not all of the defendants to an equitable action presents four–square the dangers of piecemeal review and split causes of action that the structure of appellate jurisdiction is intended to eschew, it will often implicate the policies of Section 1292(a)(1) as well to the extent that the dismissal directly and substantially affects the character of the injunctive relief sought. Accordingly, jurisdiction in this context commonly depends on an appraisal of the significance to the action of the dropped party. Thus courts have been unwilling to allow appeal under Section 1292(a)(1) when the district court has dismissed a party that is merely "ancillary" to the request for relief. *Local Union 1888 v. City of Jackson*, 473 F.2d 1028 (5th Cir. 1973). Conversely, courts have found jurisdiction when the dismissed parties are the sole parties against whom injunctive relief is sought (*Holton v. Crozer–Chester Medical Center*, 560 F.2d 575 (3d Cir. 1977); *McNally v. Pulitzer Publishing Co.*, 532 F.2d 69 (8th Cir. 1976), certiorari denied, 429 U.S. 855) or when dismissal of certain defendants will significantly contact the relief that will be available should plaintiffs prevail. *Build of Buffalo, Inc. v. Sedita*, 441 F.2d 284 (2d Cir. 1971). See also 16 Wright & Miller, Federal Practice & Procedure § 3924 at 81–82 n.43 (reconciling *Local Union 1888* and *Sedita* on these grounds).

This appeal resembles that permitted in *Sedita, supra*. In that case, plaintiffs sought preliminary and permanent injunctive relief against the Mayor of Buffalo, the Police Commissioner and various members of the Buffalo Police Department, alleging " 'a systematic pattern of conduct resulting in numerous, separate and distinct violations of the rights, privileges, and immunities' of plaintiffs and the class they seek to represent." 441 F.2d at 285. When the district court dismissed the Mayor and Commissioner the Court of Appeals permitted review under Section 1292(a)(1). The court found that dismissal of those defendants would have a "decisive" effect on the plaintiffs' request for injunctive relief, particularly since the district court would be powerless to order any relief against the remaining defendants that might address the pattern of police misbehavior alleged.

Similarly here, plaintiffs have alleged that the Secretary has failed to comply with her statutory and constitutional obligations as they affect more than any particular hospital. In particular, Claim 4 charges her with failing to adopt suitable regulations and Claim 6 with failing to monitor and enforce compliance with the Act as required by the 1975 amendments. With respect to the latter claim, the amended complaint seeks relief the Secretary alone can provide and with respect to the former it requests relief that requires substantial involvement by the Secretary. Accordingly, jurisdiction under Section 1292(a)(1) is proper.

*Gardner v. Westinghouse Broadcasting Co.*, 437 U.S. 478, 98 S.Ct. 2451, 57 L.Ed.2d 364 cited to us by defendants, does not indicate a contrary result. That case presents the distinct issue whether a denial of class action status in an injunctive action gives rise to appellate jurisdiction under Section 1292(a)(1) on the class certification question. Clearly a rule permitting such appeals would generate a flood of appeals

on an issue largely committed to the district court's discretion, an issue the Supreme Court has otherwise viewed as too unsubstantial to warrant interlocutory review. *Coopers & Lybrand v. Livesay*, 437 U.S. 463, 98 S.Ct. 2454, 57 L.Ed.2d 351. Therefore, although denial of class certification may at times result in some contraction of the available relief, other policies peculiar to class actions may outweigh that concern in any particular case. Thus it will often be the case, as in *Gardner*, that the denial of class certification will affect neither the scope of a plaintiff's claim nor the question of the legal sufficiency of any of its parts. 437 U.S. at 480–481, 98 S.Ct. at 2453. In the present case, the district court's decision affects both questions. Consequently, the class question treated in *Gardner* is simply inapposite to the case at hand and cannot alter our conclusion that jurisdiction is proper.

*Claim 4*

■ As noted, Claim 4 charges the Secretary [15] with violating due process by failing to adopt regulations requiring each facility to employ a procedure of giving notice to indigent patients of its obligation to provide uncompensated services, and of determining eligibility while offering the patient an opportunity to present affirmative evidence to an impartial officer. The district court held that the new federal regulations have largely mooted this claim with respect to the Secretary and to the extent they have not, that plaintiffs had failed to exhaust their administrative remedies. Plaintiffs here contend that Judge Holder erred in finding mootness and that exhaustion is not necessary when the constitutionality of agency action is challenged.

On appeal the Secretary has not disputed plaintiffs' assertion regarding the inapplicability of the exhaustion requirement although their argument is not without its difficulties. They have, for example, cited no case that directly addresses the issue whether exhaustion is necessary when the

constitutionality of agency action itself is not at issue but rather the sufficiency of agency–adopted procedures for meeting due process requirements is challenged. Nevertheless since the general principle is widely accepted, see *Spiegel, Inc. v. FTC*, 540 F.2d 287, 294 (7th Cir. 1976) (citing cases), and the demands of these plaintiffs and others for specific action from the Secretary have led her to exercise her discretion, we conclude that further exhaustion is not required and focus our consideration of Claim 4 on the issue of mootness and the more intractable question, not briefed by any party, whether plaintiffs are entitled to raise a due process claim under the Hill–Burton Act.

A.

Plaintiffs rely upon *County of Los Angeles v. Davis*, 440 U.S. 625, 631, 99 S.Ct. 1379, 1383, 59 L.Ed.2d 642 for the principle that a case is not moot unless there is no likelihood that a violation will recur and the effects of any past violation have been eradicated. Although *Davis* involved discrimination claims raising issues that differ in salient respects from those in this action, the spirit of that case if not its particular formula does govern the mootness issue. The question it presents here is whether the Secretary has completely filled the procedural void complained of and rendered inappropriate the relief sought. Close consideration of the amended complaint from this perspective confirms that Claim 4 is not moot.

Superficially the wording of Claim 4 and the Secretary's parsing thereof might suggest the contrary result. Claim 4 charges the Secretary with violating due process "by failing in the federal regulations * * to require a Hill–Burton facility" to provide certain due process protections. The Secretary has, of course, now adopted regulations under the Act, thereby satisfying the basic complaint. Nowhere in this claim, meanwhile, is there stated any legal basis for an

---

**15.** The other defendants cited in Claim 4 are all state officials and are therefore not parties to this appeal.

obligation on the Secretary's part to enforce such procedures, so that plaintiffs cannot overcome the appearance of mootness with respect to this claim by relying on the request in its prayer for relief for an injunction regarding such enforcement.

Furthermore, the new regulations supply most of the specific procedures plaintiffs have alleged are necessary under the Due Process Clause. Thus they provide for written notification of the availability of uncompensated services (42 C.F.R. § 124.-505(d)), written notice of denial of such services (42 C.F.R. § 124.058(c)) and the use of clear eligibility standards for granting or denying such services (42 C.F.R. § 124.-508(c)). With respect to submitting affirmative evidence on a claim and receiving a hearing before an impartial decision–maker–procedures also sought by these plaintiffs–the Secretary notes that the named plaintiffs never sought such relief from Ball Memorial Hospital and argues that they therefore lack standing under *O'Shea v. Littleton*, 414 U.S. 488, 94 S.Ct. 669, 38 L.Ed.2d 674 to raise this issue on either their own behalf or that of the class.

■ The Secretary's characterization of plaintiffs' complaint is too cramped though. The amended complaint specifically seeks a declaratory judgment on the due process point by raising the question whether the Secretary has violated their due process rights in the past and whether they are suffering any lingering effects from that violation. In this context, it is inconsequential that there may be no more specific relief the court can order the Secretary to supply. Cf. *Carey v. Piphus*, 435 U.S. 247, 98 S.Ct. 1042, 55 L.Ed.2d 252 (due process violation is itself an injury). Further, the Secretary's regulations have not granted plaintiffs the requested right to a hearing so that the question whether the Due Process Clause requires such a hearing remains a live issue below.

■ The Secretary meanwhile has supplied no authority for her suggestion that to bring suit to establish due process procedures a plaintiff must allege that he or she actually sought each particular procedure due process requires. The controlling cases reflect no such requirement. Indeed, in the seminal case of *Goldberg v. Kelly*, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287, plaintiffs alleged merely that they were terminated from welfare or were about to be terminated without due process and did not assert that they had specifically sought the kind of hearing the Supreme Court ultimately decided was necessary. Such a requirement would be anomalous because it would require a plaintiff to predict the course of constitutional development and hamper efforts to vindicate constitutional rights.

### B.

■ The Secretary does have at its disposal a more fundamental objection to the standing of these plaintiffs not only with respect to the asserted right, to a hearing but with respect to Claim 4 as a whole. To assert a due process claim, plaintiffs must demonstrate a protectible property or liberty interest. *Board of Regents v. Roth*, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548. Yet neither in the district court nor on appeal have plaintiffs indicated the source of such a right. Judge Holder merely assumed that such an interest was implicated in the course of deciding to dismiss the claims on other grounds. Our finding on mootness and exhaustion does not permit us to pass so lightly over this issue.

It is settled that:

"[t]o have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it.

\* \* \* \* \* \*

"Property interests, of course, are not created by the Constitution. Rather, they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such a state law–rules or understandings that secure certain benefits and that support claims of entitlement to those benefits. Thus, the welfare recipi-

ents in *Goldberg v. Kelly, supra*, had a claim of entitlement to welfare payments that was grounded in the statute defining eligibility for them. The recipients had not yet shown that they were, in fact, within the statutory terms of eligibility. But we held that they had a right to a hearing at which they might attempt to do so." *Board of Regents v. Roth*, 408 U.S. at 577, 92 S.Ct. at 2709.

*Roth's* reference to *Goldberg* as a case in which plaintiffs had "a claim of entitlement * * * grounded in the statute defining eligibility for them" is particularly significant for the instant case. In *Goldberg*, perhaps the most significant case for the disposition of due process claims in the public assistance field, plaintiffs sought due process protections on governmental decisions regarding termination of welfare benefits they were already receiving. *Roth's* description of *Goldberg* casts the Court's ruling there in a more general mold, characterizing the case as one in which statutorily-created eligibility criteria create an entitlement in persons who arguably meet those criteria. Due process protections are necessary to make the factual determination of actual eligibility a rational process. The case law since *Roth* generally supports the existence of a property interest when such conditional benefits are at stake. *Wright v. Califano*, 587 F.2d 345 (7th Cir. 1978); *Griffeth v. Detrich*, 603 F.2d 118 (9th Cir. 1979); see also *Greenholtz v. Nebraska Penal Inmates*, 442 U.S. 1, 99 S.Ct. 2100, 60 L.Ed.2d 668 (mandatory parole eligibility guidelines create protectible entitlement).

This case resembles the *Goldberg* line of cases in that the regulations clearly set out specific eligibility requirements that plaintiffs either will or will not meet depending on the factual circumstances. See 42 C.F.R. § 124.506. Yet the Act and regulations contain a structural element distinguishing the Hill–Burton scheme from the ordinary public assistance program. Under the regulations, not every applicant who meets the relevant eligibility criteria is clearly entitled to assistance. Rather, the regulations seem to contemplate the possibility that there will be more eligible applicants than the facilities will have resources to treat on an uncompensated basis. The eligibility cases in which an entitlement has been found ordinarily make assistance mandatory when eligibility is found. No such conclusion is possible in this case.

To the contrary, the regulations provide the facilities with two options in the allocation of their limited resources, allowing them to choose between on the one hand adopting a specific plan for the allocation of uncompensated services and on the other merely taking patients on a first–come, first–serve basis. 42 C.F.R. § 124.507(a) and (b). The former option could give rise to a specific entitlement only once a plan is adopted; to say that plaintiffs have a due process interest in a plan for the orderly allocation of uncompensated services is to assume the existence of a clear entitlement to the services that does not actually come into existence until the plan is adopted. Similarly, the first–come, first–serve option raises doubts about the presence of an entitlement since no plaintiff could ever be certain that he or she applied for the benefit early enough in any particular year to receive the benefits.

It is worth emphasizing, moreover, that this structural anomaly does not properly relate to eligibility, as in *Goldberg*, but represents a before–the–fact, practical qualification on the program. It means that mere abstract qualification for the program is insufficient and that any expectation of receiving benefits is not fully justified. The regulations themselves reflect the qualified nature of the eligibility determination in that they require the facilities to tell patients only that as the recipients of federal construction funds, they have some general service obligation and that they have to set aside certain amounts for meeting that obligation. See 42 C.F.R. § 124.505(a). It is uncertain whether such a qualified statement of obligation is sufficient to engender the kind of "legitimate claim" or expectation anticipated by *Roth*.

■ Plaintiffs may not overcome this hurdle simply by relying on their class alle-

gations. First, the amended complaint describes a class of those eligible for uncompensated services and therefore does not eliminate the gap discussed above between eligibility and entitlement under this program. Even if the amended complaint were drafted differently, it is doubtful that a class drawn merely to reflect and therefore create such an entitlement would be proper. In addition, assuming *arguendo* a class may be so drawn, there is a split of authority regarding whether we should consider the class allegations at this stage of the proceedings. Compare *Roberts v. American Airlines*, 526 F.2d 757 (7th Cir. 1975), certiorari denied, 425 U.S. 951, 96 S.Ct. 1726, 48 L.Ed.2d 195; *Case & Co. v. Board of Trade of City of Chicago*, 523 F.2d 355 (7th Cir. 1975) (summary judgment cases from this Circuit in which the Court has refused to look beyond the named plaintiffs) [16] with *City of Inglewood v. City of Los Angeles*, 451 F.2d 948 (9th Cir. 1971); 3B Moore's Federal Practice ¶ 23.50 at 423 (taking allegations regarding class as true during consideration under Rule 12(b)(6) of the Federal Rules of Civil Procedure). Most importantly, it is certain that unless these named plaintiffs or some individual can demonstrate that he or she has a legitimate claim, there are no representatives with proper standing to bring the class allegations. See *Bailey v. Patterson*, 369 U.S. 310, 82 S.Ct. 549, 7 L.Ed.2d 512, see also *Allee v. Medrano*, 416 U.S. 802, 828–829, 94 S.Ct. 2191, 2206, 2207, 40 L.Ed.2d 566 (Burger, C. J., concurring in result in part and dissenting in part) ("A named plaintiff cannot acquire standing to sue by bringing his action on behalf of others who suffered injury which would have afforded them standing had they been named plaintiffs; it

bears repeating that a person cannot predicate standing on injury which he does not share.") [17]

In a supplementary memorandum to the Court, plaintiffs have cited several cases finding a property interest under this statute and its regulations as well as under other statutes that contain similar qualifications beyond the presence of eligibility criteria. These cases are largely unpersuasive. In *Newsom v. Vanderbilt University*, 453 F.Supp. 401, 422–423 (M.D.Tenn.1973), for example, a case construing these Hill–Burton assurances,[18] the court appears to engage in a kind of legal legerdemain by finding that eligibility means entitlement and that the restrictions created by the finiteness of funds merely result in a denial of benefits that must, under *Goldberg,* comport with due process guarantees. In *Griffin v. Harris*, 571 F.2d 767 (3d Cir. 1978), the court's analysis included an express finding that the plaintiffs there, tenants receiving rent benefits as a consequence of living in certain projects selected by the Secretary of Housing and Urban Development, were "induced" by the availability of benefits to become tenants in an approved project. The form and character of the notice required under the Hill–Burton regulations preclude a finding of such inducement in this case.

■ Lastly, *Holmes v. New York City Housing Authority*, 398 F.2d 262 (2d Cir. 1968), which otherwise resembles this case, combined several of the sins of pre–*Roth* due process analysis. In that case, plaintiffs were among 90,000 eligible applicants for 10,000 places in public housing projects. The court held, one judge dissenting, that

---

**16.** In those cases the district court simply neglected to decide the class certification question. As a result, in those cases, the reasons for the Court of Appeals to accept the plaintiffs' class allegations were arguably as strong as those present here for taking that course. The authority from sources outside this Circuit is no less compelling. Because a final resolution of this difficult matter is not necessary for our disposition of the instant question, we decline to attempt one in this case.

**17.** As discussed at greater length *infra*, the question whether plaintiffs have standing and the question whether plaintiffs have an entitlement are not identical. Even assuming that plaintiffs would have standing to vindicate certain interests, their interests would differ from those that the class, with its due process entitlement, might present, so that the named plaintiffs arguably would still not be proper representatives for the class.

**18.** See note 7 *supra*.

"due process requires that selection among applicants be made in accordance with 'ascertainable standards,' * * * and, in cases where many candidates are equally qualified under these standards, that further selections be made in some reasonable manner such as 'by lot or on the basis of the chronological order of application.' " 398 F.2d at 265, citing *Hornsby v. Allen*, 330 F.2d 55, 56 (5th Cir. 1964).[19]

Having failed, however, to state with specificity the protectible interest involved, the court merely assumes its conclusion in the style of *Newsom, supra*, by finding that the very arbitrariness in the selection process, arbitrariness that should have raised doubts about the presence of any entitlement, itself necessitates due process safeguards. Such an analysis is simply inadequate for resolving our case.[20]

## C.

Some guidance for treating the special circumstances of this case does emerge from other housing cases. In *Harlib v. Lynn*, 511 F.2d 51 (7th Cir. 1975), this Court held that the housing program established under Section 221(d)(3) of the National Housing Act (12 U.S.C. § 1715e(d)(3)) gives rise to no due process protections for tenants who live in buildings financed by the program. That decision is perhaps noteworthy because of its refusal to find an entitlement in those who arguably are expected to benefit from a federal program of assistance in the construction of certain facilities. More importantly, *Harlib* relies for its conclusion upon the elaborate reasoning of then–Judge Hufstedler, dissenting in *Geneva Towers Tenants Organization v. Federated Mortgage Investors*, 504 F.2d 483, 493 (9th Cir. 1974). That reasoning relies on an analysis that provides a useful formula for resolving the due process issue in this case.

Judge Hufstedler's analysis begins from the rule discussed above, that the presence of eligibility criteria does not foreclose a finding of an entitlement, noting that "[a]n interest that gives rise to an entitlement is always a conditional interest." She quickly adds, however, that

"not all conditional interests in governmental benefits give rise to entitlements. To create an entitlement, the law must remove the decision to grant the benefit from agency discretion." 504 F.2d at 494 (footnote omitted).

To become actual entitlements, a benefit must be of a particular sort.

"Every remedial statute directly and indirectly confers benefits on numerous people. Although conferral of an actual benefit may be essential to the creation of an entitlement, not all recipients of actual benefits have entitlements. Benefits arising from a statute that can become entitlements should be restricted to those benefits conferred on those beneficiaries to whom Congress intended to extend some kind of enforceable interest or, to put it slightly differently, to whom Congress intended to create a governmental obligation." *Id.*

In a footnote at this point, she outlines a relationship directly applicable to our discussion below:

"The notion [of an enforceable interest] is akin to standing doctrines. Prerequisites to a claimant's asserting a legal obligation for the purpose of compelling prior notice and hearing are perforce more stringent than those in which he seeks to assert a legal requirement to support review of governmental action in a proceeding after the government has acted." *Id.* at 494 n.3 (citation omitted).

---

19. *Hornsby v. Allen*, 330 F.2d 55 (5th Cir. 1964), a case also cited to us by plaintiffs and specifically approved by the Supreme Court in *Goldberg v. Kelly*, 397 U.S. at 262–263 n.9, 90 S.Ct. at 1017–1018, appears to be a case in which eligibility requirements alone made the plaintiffs' interest conditional.

20. Nothing in *Bloodworth v. Oxford Village Townhouses*, 377 F.Supp. 709, 716 (N.D.Ga. 1974) or *Poirrier v. St. James Parish Police Jury*, 372 F.Supp. 1021, 1024 (E.D.La.1974), affirmed, 531 F.2d 316 (5th Cir. 1976), cases also cited by plaintiffs, supplies the necessary analysis.

Building upon these elements, Judge Hufstedler continues by noting that "a component in addition to the existence of an enforceable right" is necessary for there to be an entitlement, namely that the interests be conditional "upon the existence of one or more controvertible and controverted facts." 504 F.2d at 495. This component serves the practical side of due process, since a hearing and notice would be "pointless" if there were no such facts to resolve. Summing up, Judge Hufstedler notes:

> "From these principles we can draw a working definition of an entitlement: An entitlement is a legally enforceable interest in receiving a governmentally conferred benefit, the initial receipt or the termination of which is conditioned upon the existence of a controvertible and controverted fact. Such an interest cannot be impaired or destroyed without prior notice to the beneficiary and a meaningful opportunity for him to be heard for the purpose of resolving the factual issue." 504 F.2d 495–496.

Under this analysis, the facts here tug in different directions, making this a close case. At first blush the previously discussed structure of the Hill–Burton program seems to mean specifically that these plaintiffs simply fail to meet the first of Judge Hufstedler's requirements, that of showing some enforceable right or interest. On the other hand, the language and structure of the Act should not be viewed in a political and historical vacuum. Before the 1975 amendments to the Act, at least one court had explicitly found that indigent patients were proper third–party beneficiaries of the assurances program with standing to sue. *Euresti v. Stenner*, 458 F.2d 1115 (10th Cir. 1972).[21] This tentative conclusion soon blossomed into a recognition by some courts of a full–fledged private right of action to sue the facilities for failure to

comply with their assurances. *Saine v. Hospital Authority of Hall County*, 502 F.2d 1033 (5th Cir. 1974); *Corum v. Beth Israel Medical Center*, 373 F.Supp. 550 (S.D.N.Y. 1974); *Organized Migrants in Community Action, Inc. v. James Archer Smith Hospital*, 325 F.Supp. 268 (S.D.Fla.1971); *Cook v. Ochsner Foundation Hospital*, 319 F.Supp. 603 (E.D.La.1970). Other courts found to the contrary. *Don v. Okmulgee Memorial Hospital*, 443 F.2d 234 (10th Cir. 1971);[22] *Stanturf v. Sipes*, 224 F.Supp. 883 (W.D.Mo. 1963), affirmed, 335 F.2d 224 (8th Cir. 1964), certiorari denied, 379 U.S. 977, 85 S.Ct. 676, 13 L.Ed.2d 567; *Rogers v. Provident Hospital*, 241 F.Supp. 633 (N.D.Ill.1965).

Congress was apparently aware of this dispute when it redrafted the assurances program. Its reformulation of the Act contained language relevant to the controversy, as follows:

> "[A]n appropriate action to effectuate compliance with any such assurance may be brought by a person other than the Secretary only if a complaint has been filed by such person with the Secretary and the Secretary has dismissed such complaint or the Attorney General has not brought a civil action for compliance with such assurance within 6 months after the date on which the complaint was filed with the Secretary." 42 U.S.C. § 300p–2(c).

This language is not free of ambiguity since it does not expressly grant a private right of action to enforce the assurances but only establishes certain requirements where such an action exists. Still, viewed in the context of the earlier dispute among the courts, the language does seem to contemplate a continued private right of action against the facilities to effectuate compliance with the assurances.

As Judge Hufstedler noted in *Geneva Towers, supra*, the requirement of some en-

---

21. *Euresti* relies for this holding upon a finding that the Hill–Burton Act provides for a contract containing the assurances between the federal agency and the facility receiving federal funds. The cases do not pinpoint the precise relationship between a finding of third–party beneficiary rights and a private right of action.

22. It is curious that the Tenth Circuit in *Euresti* did not cite its earlier case of *Okmulgee Memorial Hospital* since the finding against a private right of action in the latter seems inconsistent with the finding of standing in the former.

forceable interest is "akin" to the requirement of standing. As a result, the availability to these plaintiffs of standing to sue the facilities is an initial index of an enforceable interest. Although Judge Hufstedler finds that this enforceable interest requirement is "perforce more stringent" than mere standing to sue, the two concepts are perhaps closer than she indicates. Furthermore, in this case there is not just standing, a relatively abstract, threshold concept merely requiring a sufficient stake in the controversy to contest the issues with the proper vigor (*Association of Data Processing Service Organizations, Inc. v. Camp*, 397 U.S. 150, 151–152, 90 S.Ct. 827, 829, 25 L.Ed.2d 184), but a concrete private right of action against the hospital. This private right of action, almost by definition, reflects the very sort of Congressional intendment to confer some enforceable interest upon these beneficiaries that Judge Hufstedler regarded as indicative of this first element of a protectible property interest.

This case also encounters difficulties at the second step of Judge Hufstedler's analysis. Judge Hufstedler viewed the practical side of due process as requiring that to achieve entitlement status, an enforceable interest must be conditional upon controverted or controvertible facts. On the one hand, this case seems to present such an issue. A patient's right to uncompensated services will depend upon an ability to demonstrate facts necessary both to show eligibility and to prove that the Hospital has or has not met its financial obligations for the year. On the other hand, it is not certain that this latter conditional element is of the sort anticipated by Judge Hufstedler. Her reasoning suggests that the practical side of the entitlement refers to the existence of controverted facts *regarding the claimant himself*. The existence of controverted facts about the hospital's finances, which could turn a due process hearing into full–scale litigation requiring elaborate discovery, raises some doubts about the consistency of such claims with the practical side of the due process equation.

Nevertheless, it would be a mistake to pause very long over this anomaly. The practical side of due process is not so weighty a matter that it should be permitted to overshadow completely more fundamental concerns supporting the existence of an entitlement. Minor practical concerns are best resolved in deciding what process is due rather than whether due process should be applied. Thus the courts have generally not demurred at finding an entitlement even when the resulting due process constraints may force the accused party to supply information pertaining to matters far beyond those raised by the individual grievant. For example, that an educational institution might have to supply general financial information to dispel suspicion that it refused for improper motives to re-hire a faculty member has not been thought to preclude a finding of an entitlement in the individual faculty member where the circumstances otherwise justify an expectation of continued employment. Similarly, it would be anomalous in this case to conclude that slightly unusual practical circumstances foreclose a finding of an entitlement when Congress has specifically permitted a private right of action to exist, presumably in spite of the practical obstacles.

In this context, it is significant that the structure of the Act and regulations indicate that the practical objections to the application of due process claims under Hill–Burton are in fact not very severe. The statute and regulations suggest a framework of presumptions that will place the burden of production on the party that has the relevant information. The language of the Act is one of obligation and assurances. As a result, despite the precatory language of the notices the facilities must post about their obligations, the regulations appear to anticipate that granting an application will be the usual course, perhaps because the customary level of compliance is set high enough to ensure that most applicants will receive services.[23] Accord-

---

**23.** The plaintiffs have not alleged, for example, that any Indiana facilities have adopted formal

plans for the allocation of uncompensated services. Such action, which may well have creat-

ingly, claimants will ordinarily have to demonstrate only their eligibility; in the uncommon case, the facility may perhaps seek thereafter to show exhaustion of its yearly compliance requirement or financial strain. With the practical concerns reduced in this way, it appears that Judge Hufstedler's analysis would permit this enforceable interest to achieve entitlement status.

In sum, plaintiffs here have an enforceable interest in compliance by the facilities with their assurances under the Act, an interest intended by Congress and reflected in 42 U.S.C. § 300p–2(c). This enforceable interest comports with the practical side of due process since it is conditional upon controverted or controvertible facts. That some of these facts are external to the patients' claims presents too minor an objection to entitlement status, particularly in light of the structure of the Act and regulations.[24]

These conclusions do not, of course, end the matter, for even if plaintiffs have a protectible interest it is not at all clear what process is due. In particular, we cannot now say that the expectancy created requires a full hearing before an impartial officer, as plaintiffs contend. Although we might ourselves decide this issue, it seems preferable to return the case to the district court. The condign process will depend on factual questions regarding the procedures employed by the hospital, the position of the plaintiffs and even the level of demand for their services generally. These questions cannot be decided on so exiguous a record. We therefore reverse and remand Claim 4 to permit plaintiffs to test the merits of their argument regarding the appropriate process.

*Claim 6*

Claim 6 essentially charges the Secretary with a failure to meet its enforcement obli-

gations under the Act and in particular under 42 U.S.C. § 300p–2(c). The district court relied on two alternative grounds in dismissing this claim. First, Judge Holder concluded that the statute simply does not provide for or permit a private cause of action against the Secretary for this purpose. Second, noting the exhaustion procedure the statute provides for enforcement actions by "persons other than the Secretary," he found that even if a private right of action exists, plaintiffs have failed to meet the express statutory prerequisites for such an action. On appeal, plaintiffs contend that the analysis ordinarily applied to statutes on this question indicates that a private right of action is appropriate and that requiring the plaintiffs to petition the Secretary for review of their complaints about enforcement makes little sense. In this instance, however, we believe the district court was correct.

It is necessary to pause only briefly to dispose of an additional ground for dismissal raised by the Secretary both in the district court and on appeal. The Secretary contends that because she has issued regulations and established new enforcement procedures plaintiffs' complaint about the old enforcement procedures is moot. Indeed, her counsel say "[t]here has been no showing that plaintiffs' complaints about the prior system are relevant to the operation of the new scheme" (Br. 30). The short answer to this comment is that the procedural status of this case has denied plaintiffs the opportunity to make any showing whatsoever, and it is therefore impossible to predict what evidence plaintiffs could adduce in support of their claims. They may, for example, be able to show deficiencies in enforcement that are not addressed in the current regulations and procedures. Further, plaintiffs should have the opportunity to prove, in support of their request for a

---

ed a clear entitlement, is an option that would presumably become more attractive as the demand for uncompensated services increases.

**24.** Although this result resembles in a general way those in *Newsom v. Vanderbilt Univ., supra* p. 39 and *Holmes v. New York City Housing Authority, supra* pp. 39–40 we have

reached our conclusion only after undertaking the careful scrutiny Judge Hufstedler's opinion sets out for due process analysis. Only such an analysis is responsive to the wide variation in context that appears from statute to statute.

declaratory judgment, that they have suffered lingering effects from the allegedly lax enforcement history of the Secretary. Accordingly, the claim is not moot.

We do not believe Claim 6 states a cause of action, however. Clearly, the statute does not expressly grant a right of action against the Secretary; the language of 42 U.S.C. § 300p–2(c) refers to actions only against the facility. As plaintiffs note, therefore, the presence *vel non* of a private right of action against the Secretary will depend on the analysis the Supreme Court originally set forth in *Cort v. Ash*, 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 and has since reiterated in several subsequent cases. See *e. g., Transamerica Mortgage Advisors, Inc., (TAMA) v. Lewis*, 444 U.S. 11, 100 S.Ct. 242, 62 L.Ed.2d 146, *Cannon v. University of Chicago*, 441 U.S. 677, 99 S.Ct. 1946, 60 L.Ed.2d 560. That well–known *Cort* analysis comprises four distinct factors:

"In determining whether a private remedy is implicit in a statute not expressly providing one, several factors are relevant. First, is the plaintiff 'one of the class for whose *especial* benefit the statute was enacted,' *Texas & Pacific R. Co. v. Rigsby*, 241 U.S. 33, 39, [36 S.Ct. 482, 60 L.Ed. 874] (1916) (emphasis supplied)–that is, does the statute create a federal right in favor of the plaintiff? Second, is there any indication of legislative intent, explicit or implicit, either to create such a remedy or to deny one? See, *e. g., National Railroad Passenger Corp. v. National Assn. of Railroad Passengers*, 414 U.S. 453, 458–460, [94 S.Ct. 690, 38 L.Ed.2d 646] (1974) (*Amtrak*). Third, is it consistent with the underlying purposes of the legislative scheme to imply such a remedy for the plaintiff? See, *e. g., Amtrak, supra; Securities Investor Protection Corp. v. Barbour*, 421 U.S. 412, 423, [95 S.Ct. 1733, 44 L.Ed.2d 263] (1975); *Calhoon v. Harvey*, 379 U.S. 134, [85 S.Ct. 292, 13 L.Ed.2d 190] (1964). And finally, is the cause of action one traditionally

relegated to state law, in an area basically the concern of the States, so that it would be inappropriate to infer a cause of action based solely on federal law? See *Wheeldin v. Wheeler*, 373 U.S. 647, 652 [83 S.Ct. 1441, 10 L.Ed.2d 605] (1963); *cf. J. I. Case Co. v. Borak*, 377 U.S. 426, 434 [84 S.Ct. 1555, 12 L.Ed.2d 243] (1964); *Bivens v. Six Unknown Federal Narcotics Agents*, 403 U.S. 388, 394–395, [91 S.Ct. 1999, 29 L.Ed.2d 619] (1971); *id.,* at 400 [91 S.Ct. at 2006] (Harlan, J., Concurring in judgment)." 422 U.S. at 78, 95 S.Ct. at 2088.

This Court has recently observed the *Cort* analysis is "basically a matter of statutory construction" looking to "whether Congress intended to create the private remedy asserted." *Simpson v. Reynolds Metals Co.*, 629 F.2d 1226, at 1238 (1980), quoting *Transamerica Mortgage Advisors, Inc. (TAMA) v. Lewis*, 444 U.S. 11, 15, 100 S.Ct. at 242. As a result the factors are not of equal weight and the first two or three factors can be dispositive. *Id.* at 24–25, 100 S.Ct. at 242. We believe those factors uniformly indicate that Congress did not wish to permit a private right of action against the Secretary under the circumstances alleged here.

This Court has noted with respect to the first of the *Cort* factors that courts have often used "too facile" an approach in considering whether a particular party is "one of the class for whose *especial* benefit the statute was enacted." *Simpson v. Reynolds Metals Co., supra* at 25; see also *Rogers v. Frito–Lay, Inc.*, 611 F.2d 1074, 1079 (5th Cir. 1980), certiorari denied, —— U.S. ——, 101 S.Ct. 246, 66 L.Ed.2d 115. *Simpson* and *Rogers* are cases involving the rights of handicapped persons under Section 503 of the Rehabilitation Act of 1973 (29 U.S.C. § 793 *et seq.*), which charges the Secretary with ensuring that recipients of federal funds abide by the statutory prohibition on discrimination against the handicapped.[25]

25. In construing Section 503 of the Rehabilitation Act, *Simpson* and *Rogers* contrast the language of that provision with Section 504, a much more sweeping prohibition on discrimi-

nation against the handicapped, under which a private right of action has been found. *Lloyd v. Regional Transportation Authority*, 548 F.2d 1277 (7th Cir. 1977). Section 300p–2(c) resem-

In resolving the question whether a private right of action is available to handicapped persons against non-complying institutions, they specifically distinguish between persons who are the mere subject of federal legislation and those who meet the beneficiary status of the *Cort* test. As stated there:

> "There is no intimation that every qualified handicapped person has a right to affirmative action in his particular case; what is apparent is that those who control federal contracts have a duty to make and enforce contracts containing the requisite clause. The handicapped may have simply the right to petition those who administer federal contracts to perform their duty." *Simpson v. Reynolds Metals Co., supra,* 1240 quoting *Rogers v. Frito–Lay, Inc., supra,* 611 F.2d at 1080.

This observation has particular relevance in a statute such as the Hill–Burton Act because the particular funding scheme in this Act, which requires assurances from the facilities and enforcement by the Secretary, raises similar questions about the enforceable interests of an individual plaintiff. Unlike *Simpson* and *Rogers,* of course, Congress apparently chose to create an enforceable interest in indigent patients insofar as compliance by the facilities is concerned. That difference does not, however, render nugatory the caveat expressed in *Simpson* and *Rogers* about summary findings of "especial benefit" under the first *Cort* factor. It is one thing to make the patients the direct beneficiaries of the assurances, quite another to give them an immediate interest in the particulars of federal enforcement and administration, which serve the public at large. Put more simply, the interests implicated by an action to compel local compliance with the assurances are different from those implicated by a suit to compel specific action by the Secretary to compel the facilities to comply.

With this general distinction in mind, we pass to the second and third *Cort* factors.

The parties have supplied no direct evidence of legislative intent in enacting Section 300p–2(c). Plaintiffs' various quotations from the legislative history merely demonstrate Congress' concern about the "sorry" enforcement record of the assurances under the Act. To infer from these statements that Congress intended to create the right of action sought here is to ignore the warning noted above. Indeed, to draw such an inference is merely to assume what should be proved, while ignoring several other signals Congress gave in the course of its deliberations. Until 1975, primary enforcement of the assurances program remained at the state level. Consequently, Congressional remarks about the "sorry" enforcement record under the Act, although certainly suggestive of disappointment with the Secretary, is too slender a reed on which to rest the conclusion that Congress thought the Secretary required direct prodding in the form of a private right of action. The Congressional response to the enforcement problems was specifically to transfer primary enforcement responsibility from the States to the Secretary. Without some further indication, such a step would ordinarily be viewed as adequate in itself to remedy the prevailing defects. It therefore requires a considerable leap of faith to conclude from this action that the patients thereby received new rights against the enforcement bodies.

Plaintiffs observe that some of the courts which before 1975 had permitted patients to sue the individual facilities had also permitted suits against the Secretary. *E. g., Corum v. Beth Israel Medical Center,* 373 F.Supp. 550 (S.D.N.Y.1974); *Cook v. Ochsner Foundation Hospital,* 319 F.Supp. 603 (E.D.La.1970); see also *Organized Migrants in Community Action, Inc. v. James Archer Smith Hospital,* 325 F.Supp. 268 (S.D.Fla. 1971). Far from providing some affirma-

bles Section 503 rather than Section 504. For this reason, cases such as *United Handicapped Federation v. Andre,* 558 F.2d 413, 415 (8th Cir. 1977), which plaintiffs have cited in their sup-

plementary memorandum, are inapposite to this case. *Simpson* and *Rogers* draw much of this analysis from *Cannon,* 441 U.S. at 690–692 n.13.

**46**

tive evidence of an intention to create a private right of action against the Secretary, these cases suggest just the opposite result. None of these cases considered the question in the depth that *Cort* demands.[26] Further, acting against this backdrop of suits against both state and federal defendants, Congress chose to amend the statute to acknowledge a private right of action against the facilities while placing--without any similar acknowledgement--enforcement powers in the Secretary. As a result, by the principle of construction that recognizes that the selection of one of two possibilities suggests the exclusion of the other, the amendments indicate an intention not to extend a private right of action to cases involving the Secretary.

Similarly, scrutiny of the third *Cort* factor--the purposes of the legislative scheme--raises substantial doubts about the existence of the sought--for right. For example, plaintiffs' contention that the statutory exhaustion prerequisite to suits against the facility makes no sense when applied to suits against the Secretary also suggests the conclusion that suits against the Secretary are inconsistent with the statutory format. In addition, what case law is available construing statutes of this sort has found that private rights of action are inconsistent with such enforcement schemes. Thus in *National Assoc. for the Advancement of Colored People v. Medical Center, Inc.*, 599 F.2d 1247, 1254, n.27 (3d Cir. 1979), the court held, relying in part on *Cannon v. University of Chicago*, 441 U.S. 677, 706–707 n.41, 99 S.Ct. 1946, 1962–1963, 60 L.Ed.2d 560, that a private right of action to compel a federal agency to enforce provi-

sions of an Act resembling this one would allow individuals to circumvent the procedural limitations of the legislative enactment.[27] Plaintiffs argue here that *Medical Center* was a case in which relief was sought only with respect to a single facility receiving federal funds and therefore the plaintiffs there could gain complete relief without proceeding directly against the federal defendant. Although the court in *Medical Center* did mention this fact in stating its finding, the conclusion it drew was the far more general one that permitting any such action was inconsistent with the statutory scheme.[28]

Furthermore, *Cannon* itself implied that the involvement of more than one facility and deficiencies in the overall enforcement scheme will give rise to an action by an individual beneficiary against the federal enforcement agency only under extreme circumstances, citing *Adams v. Richardson*, 480 F.2d 1159 (D.C.Cir. 1973). 441 U.S. at 707 n.41. *Adams* is representative of a line of cases in which the federal agencies not only failed to meet an enforcement obligation, but actually declined to act in the face of clear wrongdoing at the state level. The agencies in these cases had often stopped just one step short of engaging in a kind of complicity with the improper state action. See also *Garrett v. City of Hamtramck*, 503 F.2d 1236, 1247 (6th Cir. 1974); *United States v. City of Chicago*, 395 F.Supp. 329, 342 (N.D.Ill.1975), affirmed by unpublished opinion, 525 F.2d 695 (7th Cir. 1975). As a result, if this case represents a more serious enforcement lapse than that presented in *Medical Center*, it still falls far short of the kind of wholesale neglect that has ordinari-

---

**26.** This defect is even more pronounced in the two most recent cases, decided after the 1975 amendments, each of which simply assumes that an action against the Secretary is proper. See *Newsom v. Vanderbilt University*, 453 F.Supp. 401 (M.D.Tenn.1978); *Lugo v. Simon*, 453 F.Supp. 677 (N.D.Ohio 1978).

**27.** This principle is most familiar in, though not restricted to, the context of private actions to force federal agencies to cut off funds under certain statutes to an assertedly noncomplying

local facility or institution. *E. g., Medical Center, supra; United States v. City of Chicago*, 395 F.Supp. 329 (N.D.Ill.1975), affirmed by unpublished opinion, 525 F.2d 695 (7th Cir. 1975).

**28.** It should be recalled that plaintiffs themselves have a claim that extends beyond a single facility only if they are entitled at this stage of the litigation to have their class allegations taken as true, an issue we have declined to decide.

ly given rise to rights against federal agencies.[29]

Furthermore, as plaintiffs themselves concede (Reply Br. 22 n.13), *Adams* was a case under the Administrative Procedure Act (APA), not the specific regulatory scheme there at issue. Although plaintiffs contend that the differences between a private right of action under the Hill–Burton Act and the mandate of the APA are inconsequential, we do not share their unconcern for the differences between the two types of actions. Such glib treatment of the jurisdictional basis of a particular lawsuit not only is inconsistent with the basic notice requirements of judicial practice in our system, but also rather blithely ignores the practical differences the two approaches may engender for the nature and course of the litigation. In short, plaintiffs cannot at this stage alter the entire theory of their action with a mere wave of the hand. Judge Holder therefore correctly dismissed this claim of the amended complaint.

Judgment affirmed in part, reversed and remanded in part. Parties to bear their own costs. Because Judge Holder has retained control of the remainder of this litigation, Rule 18 shall not apply.

FAIRCHILD, Chief Judge, concurring in part, dissenting in part.

The "private cause of action" which is the subject of this appeal is one seeking judicial review of certain action and failure to act by the Secretary. It seems to me that both Claim 4 and Claim 6, against the Secretary, must be analyzed in those terms.

In making this analysis, I find little help in *Cort v. Ash*, 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975) or *Cannon v. University of Chicago*, 441 U.S. 677, 99 S.Ct. 1946, 60 L.Ed.2d 560 (1979). These decisions dealt with the question whether a federal statute expressly prohibiting conduct implies a federal cause of action against one who engages in the forbidden conduct and in favor of one who has been injured by it. That is not our case on this appeal.

As Judge Cummings points out, Claim 4 was originally directed at the Secretary's failure to adopt a regulation in response to the 1975 amendments. Since the adoption of the regulation, Claim 4 has been converted to a challenge to its adequacy, particularly concerning hearing procedures.

Unlike instances where a statute creates an entitlement and the administrator denies a claim of entitlement without affording due process, the Secretary's regulation, implementing the statute, creates the entitlement, but is alleged to permit the hospitals to deny without affording due process.

Claim 4 in substance seeks judicial review of a regulation alleged to be an inadequate performance of an administrator's statutory duty. I can agree with the opinion of the Court that in the light of the history of this case, it was unnecessary for the plaintiff to petition the Secretary for an amendment before asserting the deficiency in court.

I can further agree that plaintiffs have shown sufficient standing to seek judicial review of the regulation with respect to the adequacy of hearing procedures, and that it is appropriate to return the matter to the district court to determine such adequacy.

Claim 6 seeks judicial review of the Secretary's failure to take compliance and enforcement action required by the statute.

An administrator's duty to enforce is ordinarily highly discretionary, and for that reason his choices with respect to enforcement are not ordinarily subject to judicial review. *See* 5 U.S.C. § 701(a)(2); Davis, *Administrative Law Treatise*, § 29.16. A court does, however, have power to review "agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1). *See Caswell v. Califano*, 583 F.2d 9 (1st Cir.

---

**29.** *Leedom v. Kyne*, 358 U.S. 184, 79 S.Ct. 180, 3 L.Ed.2d 210, also lends plaintiffs' argument no support. Unlike this case, *Leedom* involved a federal agency acting in excess of its statutory powers, thereby failing to comply with a clear statutory duty not involving an application of substantial discretion. As we have suggested, the particulars of enforcement of the assurances program belie an attempt to describe the Secretary's duties as purely or even primarily ministerial.

1978); *Cannon v. University of Chicago,* 559 F.2d 1063, 1077 (7th Cir. 1976), *rev'd on other grounds* 441 U.S. 677, 99 S.Ct. 1946, 60 L.Ed.2d 560 (1979); *Poirrier v. St. James Parish Police Jury,* 531 F.2d 316 (5th Cir. 1976), *rehearing denied* 537 F.2d 840 (1976), adopting 372 F.Supp. 1021 (E.D.La.1974). Claim 6(b) through (d) alleges that the Secretary has failed to carry out the monitoring of assurances required by 42 U.S.C. § 300p–2(c). She has no discretion to decide whether or not to comply with that section.

In my opinion, dismissal of Claim 6 was also inappropriate, and plaintiffs should have the opportunity to prove their claim of total failure to perform specific statutory duties.